**ATLANTA GAS LIGHT COMPANY et al., Plaintiffs,**

v.

**SOUTHERN NATURAL GAS COMPANY and Federal Power Commission, Defendants.**

**Civ. A. No. 16060.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 11, 1972.

Morgan, Lewis & Bockius, Washington, D. C., Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for Atlanta Gas Light Co.

Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for Ga. Power Co.

Arthur K. Bolton, Atty. Gen., Atlanta, Ga., for Ga. Public Service Comm.

Bouhan, Williams & Levy, Savannah, Ga., for Savannah Elec. & Power Co.

King & Spalding, Atlanta, Ga., for Southern Natural Gas Co.

George W. McHenry, Jr., Gen. Counsel, F.P.C., Washington, D. C., for Federal Power Comm.

### ORDER

RICHARD C. FREEMAN, District Judge.

This action stems from the nation's diminishing supply of natural gas.[1]  Al-

---

[1]. This diminishing supply has been judicially noticed by the Fifth Circuit. Louisiana Power & Light Co. v. United Gas Pipe Line Co., 456 F.2d 326 (5th Cir. filed Jan. 14, 1972);  Southern Louisiana Area Rate Cases v. F.P.C., 428 F.2d 407 (5th Cir. 1970).

though plaintiffs style the action as one for breach of contract, the gravamen of the complaint is an attack on the statutory authority and procedures followed by the Federal Power Commission (FPC) in the allocation of natural gas. Plaintiffs are three public utilities— Atlanta Gas Light Company, Georgia Power Company and Savannah Electric and Power Company—and a regulatory agency of the State of Georgia—the Georgia Public Service Commission. Defendants are an interstate gas pipeline company—Southern Natural Gas Company—and a regulatory agency of the United States—the Federal Power Commission (FPC). Plaintiffs bring the action in three counts. The first count seeks injunctive and declaratory relief. In the second and third counts plaintiff Atlanta Gas seeks money damages for breach of contract and specific performance of its contract with defendant Southern Natural Gas. Plaintiffs assert that this court has jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity of citizenship) and 28 U.S.C. § 1391(e) (civil actions against agencies of the United States).

Defendants have moved to dismiss the action on the following grounds:

(1) failure to state a claim for which relief can be granted;

(2) failure to exhaust administrative remedies; and

(3) lack of jurisdiction over the subject matter.

Because this court had grave reservations as to its jurisdiction, oral argument concerning the jurisdictional aspects of the action was heard on January 26, 1972.

■ In ruling on defendants' motions to dismiss, this court must accept all of plaintiffs' well pleaded allegations of fact as true. However, the court is not required to accept as true any sweeping legal conclusions cast in the form of factual allegations. *See, e. g.,* Pauling v. McElroy, 107 U.S.App.D.C. 372, 278 F.2d 252 (1960); 2A J. Moore, Federal Practice ¶ 12.08, at 2267 (2 Ed. 1968).

This does not mean that for the purpose of these motions, the court is limited to the allegations of the complaint. The court may also consider any facts of which it may take judicial notice. *See,* Buell v. Sears, Roebuck & Co., 321 F.2d 468 (10th Cir. 1963); United States v. Provident National Bank, 259 F.Supp. 373 (E.D.Pa.1966). The following statement of the case is presented in accordance with the above principles.

### STATEMENT OF THE CASE

Plaintiff Atlanta Gas is a Georgia corporation with its principal office in Atlanta which is engaged primarily in the purchase, sale and distribution of gas as a public utility in 194 cities and communities in Georgia and provides service to approximately 675,000 consumers. Atlanta Gas operates pursuant to certificates of public convenience and necessity issued by the Georgia Public Service Commission and is subject to the jurisdiction of that Commission. Plaintiff Georgia Power is a Georgia corporation with its principal place of business in Atlanta, which is engaged as a public utility in the generation, transmission and sale of electricity to consumers in 154 of the 159 counties in Georgia and is also subject to the jurisdiction of the Georgia Public Service Commission. Plaintiff Savannah Electric is a Georgia corporation with its principal place of business in Savannah, which is engaged as a public utility in the generation, transmission and sale of electricity to consumers located in an area in southeastern Georgia approximately 62 miles long and 53 miles wide, which includes all of the county of Chatham and parts of Bryan, Effingham, Screven and Bulloch Counties, Georgia, and which area has a population of approximately 210,-000 people. Savannah Electric is also subject to the jurisdiction of the Georgia Public Service Commission. Plaintiff Georgia Public Service Commission is an agency of the State of Georgia, charged by the laws of Georgia with the authority and duty, among other things, of regulating the rates and charges of gas and electric utilities as well as with

protecting the interest of gas and electric consumers in the State of Georgia.

Defendant Federal Power Commission (FPC) is an agent of the United States created by an Act of Congress, and charged among other things, with the administration of the Natural Gas Act (15 U.S.C. § 717). Defendant Southern Natural Gas Company is a Delaware corporation, with its principal place of business in Birmingham, Alabama, which is licensed and does business in Atlanta, Georgia. Southern Natural is a "natural gas company" as defined by the Natural Gas Act, engaged primarily in the transportation and sale of natural gas in the states of Louisiana, Mississippi, Alabama, Georgia, and South Carolina, and has customers located in each of these states. Some of these customers, such as Atlanta Gas, are distributors, who purchase gas from Southern Natural and resell it to their own customers. The customers of such distributors purchase or consume gas for domestic, commercial and industrial purposes. The rates under which such distributors purchase gas from Southern Natural are regulated by the FPC. The distributor customers purchase gas from Southern Natural under two types of rate schedules. One is known as a "contract-demand" type of rate schedule, under which the customer is entitled to purchase certain maximum contract quantities specified in the contract between such customer and Southern Natural. The customer pays a "contract-demand charge" for such right. A separate charge, known as a "commodity charge" is paid for the actual volumes purchased. The other type of rate schedule is known as an "authorized overrun" schedule. Under this type of. schedule, Southern Natural makes available to its distributor customers any excess quantities of gas that remain after the contract entitlements under the contract-demand schedules have been supplied. Southern Natural's customers pay only a unit charge for the quantity of gas taken under such schedules. All of such rate schedules and the general terms and conditions relating thereto are contained in Southern Natural's FPC Gas Tariff.

Southern Natural also has industrial customers in each of these states who purchase gas from Southern Natural for their own direct use. The rates or prices at which these direct customers purchase gas from Southern Natural are contracted for by such parties and are not regulated by the FPC. These direct customers purchase gas from Southern Natural under special contracts, which provide either for firm service (i. e., service not subject to interruption) or interruptible service.

Atlanta Gas purchases the major portion of its natural gas supply from Southern Natural and is that company's largest customer. The great bulk of this gas is purchased under contract-demand type rate schedules as described above. At this time, the contract-demand quantities of Atlanta Gas from Southern Natural are approximately 737,000 thousand cubic feet per day (Mcf/day). During the twelve-month period ended November 30, 1971, Atlanta Gas purchased in excess of 241,452,000 Mcf of gas from Southern Natural for which Atlanta Gas paid approximately $106,-195,000. All of the gas sold by Atlanta Gas is sold under rate schedules approved and ordered by the Georgia Commission. These rate schedules generally may be grouped in three categories—those available to domestic, commercial and industrial customers. The schedules applicable to residential customers provide for firm service, while those available to commercial and industrial customers provide either for firm or interruptible service. These rate schedules, as well as the rules and regulations ordered by the Georgia Commission for Atlanta Gas, state the conditions upon which Atlanta Gas shall supply gas to its various classes of customers.

Georgia Power purchases substantial quantities of natural gas from Atlanta Gas on an interruptible basis for the purpose of generating electricity at

three of Georgia Power's eight steam-electric plants. The use of natural gas by Georgia Power enables it to maintain supplies of other generating fuels at safe levels. This advantage is of critical importance in times of fuel supply shortages. In addition, the use of natural gas by Georgia Power is a major factor in maintaining the output of pollutants from the plants which burn gas at satisfactory levels. These three generating facilities, Plants Atkinson, Arkwright and Yates, are relatively old plants, having been constructed prior to the establishment of air pollution control regulations. They are located in a part of Georgia which is a region of frequent high air pollution potential. While the newer and more modern plants of Georgia Power are being equipped with efficient electrostatic precipitators to remove fly ash and extremely tall stacks to disperse sulphur emissions, either these three older plants cannot easily be backfitted with pollution control devices, or the probable useful life of the plants does not justify the large capital investments which would be required.

Savannah Electric purchases substantial quantities of natural gas from Atlanta Gas on an interruptible basis for the purpose of generating electricity. All of Savannah Electric's power plants (Riverside, Port Wentworth and Boulevard) are equipped to utilize natural gas. Because natural gas is a comparatively inexpensive fuel and because it is relatively free of air pollutants, it is the most desirable fuel available to Savannah Electric. As in the case of Georgia Power, the use of natural gas as boiler fuel enables Savannah Electric to obtain savings in fuel costs, to maintain supplies of other fuels at safe levels and to limit the output of pollutants from Savannah Electric's plants to satisfactory levels.

Anticipating the problems that could be created by the diminishing supply of natural gas, the FPC on April 15, 1971, issued Order 431.[2] (18 C.F.R. 2170).

2. Order 431 provides in part:

§ 2.70 Measures for the Protection of Reliable and Adequate Natural Gas Service.

This Commission, charged with the responsibility for natural gas reliability, hereby promulgates as a statement of general policy that jurisdictional pipeline companies shall take all steps necessary for the protection of as reliable and adequate service as present supplies and capacities will permit during the 71–72 heating season and thereafter, including adequate injection into storage in anticipation of the heating season.

In order to effectuate the foregoing:

(1) During the storage injection season all natural gas pipelines subject to the jurisdiction of the Commission should make every reasonable effort to fill all storage fields supplied by such pipelines to a capacity sufficient to meet the anticipated heating season demands.

(2) All jurisdictional pipelines will within 30 days hereof, submit a written report (four copies) to the Secretary of the Commission indicating how the instant statement of policy will be implemented. Pipelines responding that curtailment will be necessary will file a tariff sheet, pursuant to Sections 4 and 5 of the Natural Gas Act and the Commission's Regulations thereunder, setting forth a curtailment plan to effectuate the instant policy or state that the curtailment program, if any, currently on file will effectuate this policy. The curtailment plan proposed may be divided between the injection season and the heating season, since different objectives may require different treatment.

Consideration should be given to the curtailment of volumes equivalent to all interruptible sales and to the curtailment of large boiler fuel sales where alternate fuels are available.

(3) The Commission recognizing that additional short-term gas purchases may still be necessary to meet the 1971–72 demands, will continue the emergency measures referred to earlier for the stated 60-day period. If the emergency purchases are to extend beyond the 60-day period paragraph 12 in the Notice issued by the Commision on July 17, 1970, in Docket No. R–389A should be utilized (35 F.R. 11638). The Commission will consider limited term certificates with pregranted abandonment, if the pipeline demonstrates emergency need, after complying with paragraphs 1 and 2, above.

(4) Where emergency gas purchases are made and/or a curtailment program is instituted to implement the above policy the pipeline should place, or already have

That Order provides as a matter of general policy that pipeline companies under its jurisdiction take all necessary steps to insure adequate gas service for the 1971–72 winter heating season and thereafter. Order 431 required that jurisdictional pipeline companies file a written report with the FPC indicating how they intended to implement this general policy. It further required that pipeline companies, reporting that "curtailment" will be necessary to implement the policy, must file a tariff sheet setting forth the plan of curtailment if such plan is not currently on file. That order also provided that if the tariffs containing the curtailment plans are approved by the FPC, the tariffs will control in all respects notwithstanding inconsistent provisions in the sales contracts entered into prior to the date of approval of such tariff.

On November 24, 1971, and in compliance with Order 431, Southern Natural tendered to the FPC for filing revised tariff sheets that set forth its curtailment plan. This plan reduces the quantities of gas that Southern Natural is required to deliver to its contract customers including Atlanta Gas. This plan purports to establish priorities according to the ultimate use of gas. It provides that Southern Natural will not deliver certain volumes of gas specified in the contracts with its customers where such gas is resold as fuel for electric generation in a plant where generation of electricity for sale represents the primary function of such plant and alternate fuels for such plant are readily available. Under the plan Southern Natural will not reduce the "demand charges" to its

distributor customers even though it delivers less than the specified contract demand volumes.

On December 1, 1971, the FPC published notice of the proposed tariff changes tendered by Southern Natural. (36 Fed.Reg. 23180). Pursuant to that notice, Atlanta Gas filed a Protest and Petition for Leave to Intervene and Motion to Dismiss; Georgia Power filed a Petition to Intervene; the Georgia Public Service Commission filed a Notice of Intervention and Protest; and Savannah Electric filed a Petition for Leave to Intervene. In these pleadings, the plaintiffs sought leave to intervene in the proceedings concerning Southern Natural's proposed tariff changes and presented therein various legal objections to the filing by Southern Natural and to its request that the filing be approved by the FPC.

By Order dated December 23, 1971, the FPC suspended and deferred use of Southern Natural revised tariff sheets containing the curtailment plan for a nominal period of one day. That Order provides in part:

Southern has stated that curtailments of firm service may be required during this heating season and its present tariff does not contain a curtailment procedure. Consequently, we believe that a one-day suspension period, as requested by Southern, is warranted in this case. Our action to suspend for one day will accomplish the goal of permitting Southern to invoke a standard procedure when curtailment is warranted and at the same time, the plan will be in effect subject to re-

in effect, volumetric limitations on sales at current levels.

(5) Notice should be taken that the Commission will reexamine existing commodity rate levels and, to the extent necessary, may redesign existing commodity-demand rate relationships in present and future pipeline rate cases.

(6) Pipelines who can do so are encouraged to propose exchange arrangements with other pipe lines.

(7) Jurisdictional pipelines have the responsibility in the first instance to adopt

a curtailment program by filing appropriate tariffs. Such tariffs, if approved by the Commission, will control in all repects notwithstanding inconsistent provisions in sales contracts, jurisdictional and non-jurisdictional, entered into prior to the date of the approval of the tariff.

Nothing stated herein should be construed as placing a limitation on measures to be taken by jurisdictional pipelines to effectuate the instant policy. (18 C.F.R. 2.70)

fund with interest to protect Southern's customers.[3]

On or about January 11, 1972, Southern Natural instituted its plan as set forth in the revised tariff sheets filed with the FPC. Since January 11, 1972, Southern Natural adhering to its "curtailment plan" has failed and refused to deliver to Atlanta Gas the volumes of gas up to the demand quantities as specified in the contract between Southern Natural and Atlanta Gas.

Plaintiffs instituted the present action seeking a declaration that the actions of the FPC with respect to the curtailment plan in Southern Natural's revised tariff are null and void. Plaintiffs also seek the following relief as against Southern Natural:

1. A declaration that implementation of such curtailment plan by Southern Natural constitutes a breach of the contract between Atlanta Gas and Southern Natural;

2. An injunction against Southern Natural restraining implementation of such plan;

3. Specific performance of the contract between Southern Natural and Atlanta Gas;

4. Damages against Southern Natural in a sum in excess of $10,000; and

5. Such other and further relief as may be meet and proper.

Plaintiffs base their requests for relief as against the FPC on the following contentions:

1. The actions of the FPC with respect to the curtailment plan as set forth in Southern Natural's revised tariff are beyond the statutory powers of the FPC and are therefore null, void and of no effect.

2. If such actions of the FPC are within the powers vested in it by any of the provisions of the Natural Gas Act (15 U.S.C. § 717), the application of such provisions in connection with

Southern Natural's curtailment plan are unconstitutional as a denial of due process.

3. The actions of the FPC respecting Southern Natural's curtailment plan violate the mandatory provisions of the National Environmental Policy Act (42 U.S.C. § 4321 et seq.).

Plaintiffs base their requests for relief as against Southern Natural on the following contentions:

1. Deliveries by Southern Natural to Atlanta Gas of volumes of gas below the contract demand quantities in accordance with Southern Natural's curtailment plan are contrary to and will be in breach of contract between Southern Natural and Atlanta Gas.

2. The implementation of Southern Natural's curtailment plan will cause grave, continuing and irreparable damage to Atlanta Gas, Georgia Power, Savannah Electric and their gas and electric consumers in the State of Georgia whose interest the Georgia Public Service Commission is charged with protecting.

3. Plaintiffs have exhausted their administrative remedies before the FPC and there are no adequate remedies before the FPC to redress and prevent irreparable harm to the plaintiffs.

## JURISDICTION

Congress has delegated the administration of the Natural Gas Act (15 U.S.C. § 717) to the FPC. That delegation gives the FPC exclusive jurisdiction to entertain problems arising under the Act. Congress has provided that review of FPC action taken under the Act, other than non-reviewable acts of discretion, can be obtained in the Court of Appeals.[4] District Courts are thereby generally precluded from entertaining actions involving issues arising under the Act. Therefore, this court must first determine whether the issues presented in this action arise under the Act or

---

3. Order Suspending Proposed Tariff Sheets, Southern Natural Gas Company, Docket RP72, 74 (Dec. 23, 1971) at 2.

4. Section 19 of the Act provides for such review.

whether they fall within any exception to these general jurisdictional guidelines so as to come within this court's normal jurisdictional powers.

The court begins with a determination of what regulatory powers Congress delegated to the FPC under the Natural Gas Act. The court need look no further than § 1(b) [5] of the Act for the extent of its coverage. The Supreme Court defined the coverage of the Act as outlined in § 1(b) in Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947) as:

> Three things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) *its sale in interstate commerce for resale*; and (3) natural gas companies engaged in such transportation or sale.
>
> At 516, 68 S.Ct. at 195.

(emphasis added).

■ Thus, generally, the FPC has the exclusive jurisdiction to regulate sales of natural gas for resale. The contract between Southern Natural and Atlanta Gas, on which the present action is based, involves such sales. Clearly, then, Congress has delegated to the FPC the exclusive jurisdiction to regulate the sales in question between Southern Natural and Atlanta Gas. Inherent in this jurisdiction is the FPC's exclusive jurisdiction to regulate curtailments of such sales for resale. *See*, Panhandle East. Pipe Line Co. v. Michigan Consol. Gas Co., 177 F.2d 942 (6th Cir. 1949). Plaintiffs concede in their brief that the FPC has jurisdiction over curtailments, but through this action they seek to attack the procedures used by the FPC to administer curtailments. Wading through form and extracting the substance, plaintiffs' contentions can essentially be stated in the following manner:

I. Atlanta Gas should be allowed relief for breach of contract by Southern Natural even though the alleged reason for the breach (curtailment) is a matter within the exclusive jurisdiction of the FPC.

II. The FPC has exceeded its statutory authority by allowing Southern Natural's curtailment plan to be filed and processed under § 4 [6] of the Act rather

---

5. Section 1(b) states:
   The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, *to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use*, and to natural gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.
   15 U.S.C. § 717(b) (emphasis added).

6. The relevant parts of Section 4 state:
   (d) Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.
   15 U.S.C. § 717c(d).
   (e) Whenever any such new schedule is filed, the Commission shall have authority, either upon complaint of any State, municipality, State Commission or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification or service; and, pending such hearing and the decision thereon, the

than requiring it to be filed and processed under Section 5(a) [7] or Section 7(b) [8] and therefore the FPC's actions in regard to the plan should be set aside.

III. Even if the FPC acted within its statutory powers by allowing Southern Natural's curtailment plan to be filed and processed under § 4, the FPC's actions should be set aside as the proce-

dures in the present case under § 4(e) violate due process in that they allowed the plan to go into effect without a prior hearing.

IV. The FPC's procedures under § 4 with regard to Southern Natural's curtailment plan violate § 102 of the National Environmental Policy Act [9] in that the FPC did not conduct an environmen-

Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect, and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to, refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible. 15 U.S.C. § 717c(e).

7. Section 5(a) states:
Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality,

State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates. 15 U.S.C. § 717d (a).

8. Section 7(b) states:
No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment. 15 U.S.C. § 717f(b).

9. Section 102 states in part:
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

tal impact study prior to issuance of its Order of December 23, 1971.

## I.

Plaintiffs' first contention is that by bringing this as a diversity action for breach of contract, they fall within an exception to the FPC's jurisdiction over sales of gas for resale. Thus they contend that this court has jurisdiction and that its normal law and equity powers have been invoked. The Supreme Court has carved out a very limited exception to the FPC's jurisdiction over sales for resale. *See,* United Gas Pipe Line Co. v. Memphis L., G. & W. Div., 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed. 2d 153 (1958); United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). There the Court held that an action could be maintained, notwithstanding the filing provisions of § 4 of the Act, to recover damages caused by an unilateral breach of contract between a gas pipeline company and one of its customers. It is interesting to note that both cases originated in an action before the FPC and proceeded by review to the Court of Appeals—neither action was brought in the District Court. A careful reading of these cases reveals that the Court recognizes that contracts involving the sale of natural gas for resale are subject to the paramount authority of the FPC and therefore the exception noted in these cases is very narrow.

In any event the present action does not fall within the exception created by these cases as they involved an unilateral breach of contract instigated by the pipeline company whereas the alleged breach in the present action (Southern Natural's curtailment) was instigated by the FPC's Order 431. Under that Order jurisdictional pipeline companies (Southern Natural is one) were required by the FPC to submit a plan of curtailment. This state of facts makes the present case easily distinguishable from *Memphis* and *Mobile.*

The court also notes that the Sixth Circuit has held that District Courts do not have jurisdiction to grant injunctive relief or specific performance in actions involving curtailment proceedings. *See,* Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., 177 F.2d 942 (6th Cir. 1949); Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 173 F.2d 784 (6th Cir. 1949).

Plaintiffs do not contest the fact that curtailments are within the exclusive jurisdiction of the FPC. Thus this action does not actually contest the regulatory power of the FPC to modify or change contracts involving sales for resale but rather it seeks a ruling that such power may only be exercised under § 5 or § 7 of the Act. Therefore, this court does not have jurisdiction to entertain plaintiffs' alleged action for breach of contract.

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes. 42 U.S.C. § 4332(2) (c).

## II.

Plaintiffs' second contention is a direct attack on the FPC's action allowing Southern Natural's curtailment plan to be filed under § 4(d) rather than § 5 or § 7. Although FPC action ordering a suspension of rates under § 4(e) is nonreviewable, FPC action allowing the filing of tariff sheets in a manner not within its power may be reviewed by the Court of Appeals. *Compare* Arrow Transportation Co. v. Southern Rwy. Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963) *with* United Gas Pipe Line Co. v. Memphis, L., G. & W. Div., 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958).

Under § 19 of the Act the Court of Appeals' power to review an FPC action is not limited to the review of final action. It has the power to review any FPC order that is definitive and deals with the merits of the proceeding before the FPC and the action must have impact upon the plaintiffs' rights and must be of such a nature as to cause irreparable injury if not challenged. *See* Amerada Petroleum Corp. v. FPC, 285 F.2d 737 (10th Cir. 1960). Thus an attack on such agency action must be ruled on by the FPC with review pursued in the Court of Appeals as provided for in § 19 of the Act.[10] Therefore, this court is without

10. Section 19 states:

(a) Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

(b) Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing a written petition praying that the order of the commission be

modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the Court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming the Commission, shall be final, subject

jurisdiction to entertain plaintiffs' second contention.[11]

## III.

■ Plaintiffs' third contention is another thrust of the same direct attack mounted in their first contention. Here, plaintiffs seek to attack directly the FPC's action allowing the filing and subsequent commencement of Southern Natural's curtailment plan by raising a denial of due process argument. As with the first contention, plaintiffs must present their argument attacking the filing to the FPC with review by the Court of Appeals. Therefore, this court has no jurisdiction to entertain plaintiffs' second contention.[12]

## IV.

■ Plaintiffs' fourth contention is also a direct attack on the FPC's action allowing the filing. The NEPA imposes an affirmative burden only on governmental agencies, not on private parties such as Southern Natural. Plaintiffs seek to have that order set aside because the FPC did not conduct an environmental impact study as required by § 102 of the NEPA prior to allowing the filing and commencement of South-

ern Natural's curtailment plan. As with the other contentions, this one must be ruled on by the FPC with review by the Court of Appeals since, in effect, it contests the validity of agency action—the FPC's filing of Southern Natural's plan under § 4. Therefore, plaintiffs' fourth contention does not state a claim that can be entertained by this court.

## CONCLUSION

Because of the finite supply, any reasonable gas allocation plan must consider the rights and needs of all of Southern Natural's customers. The underlying question raised by this action is who is to protect the rights of the other customers of Southern Natural. The answer seems obvious—the FPC regulates Southern Natural's activities with all its customers and is charged with acting in the public interest; the FPC is the only body with sufficient expertise and jurisdiction to decide who gets what gas. The matter is presently pending before the FPC—all of the parties to this action, as well as Southern Natural's other customers not presently before nor within the jurisdiction of this court, will have the opportunity to participate in the proceeding before the FPC.

to review by the Supreme Court of the United States upon certiorari or certification as provided in sections 346 and 347 of Title 28.

(c) The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order. 15 U.S.C. § 717r.

11. Without passing on the merits of this contention the court feels constrained to point out that nowhere in the Act is the term "curtailment" used. The lack of any reference to curtailment in the Act raises a serious question of law as to the proper section under which the FPC must proceed in exercising its curtailment jurisdiction. However, the Court of Appeals is the proper forum in which to raise this issue. *See, e. g.,* Moss v. C. A. B., 139 U.S.App.D.C. 150, 430 F.2d 891

(1970) (where the same type of procedural attack was sustained).

12. Without passing on the merits of this contention the court would point out that under § 4(e) of the Act the FPC has the power "pending such hearing and the decision thereon" to suspend the commencement of a tariff sheet for up to five months. The use of the words "pending such hearing" imply that a hearing must be held before final action is taken on the merits of the curtailment plan. The fact that agency action takes effect prior to a hearing does not amount to denial of due process when a hearing on the merits of such action is held subsequently. *See* K. Davis, Administrative Law Treatise § 7.10 (1958). If plaintiffs feel the FPC is dilatory in holding such hearing plaintiffs' relief may lie by writ of mandamus. However, this court has been notified that on March 14, 1972, hearings before the FPC on the merits of Southern Natural's curtailment plan will commence.

At this time the FPC is the proper and only forum for a gas allocation determination—any different conclusion would lead to a chaotic situation since, for example, a court in Mississippi could determine what gas consumers should receive in that state while, at the same time, an Alabama court was trying to protect Alabama consumers of gas. If that kind of situation were allowed, certainly all of Southern Natural's customers in other states would begin the race to the courthouse. Then which court would Southern Natural obey—more importantly, where would Southern Natural get the gas to meet all the mandates of the various courts?

Since plaintiffs have failed to raise an issue within this court's jurisdiction, defendant's motions to dismiss are hereby granted.

It is so ordered.