773 F.Supp. 997 (1991)
STATE OF MICHIGAN, et al., Plaintiffs,
v.
UNITED STATES of America, et al., Defendants.
No. 5:90-CV-27.
United States District Court, W.D. Michigan.
August 28, 1991.
*998 Charles C. Schettler, Jr., Asst. Atty. Gen., Frank J. Kelley, Atty. Gen., Environmental Protection Div., John C. Scherbarth, Asst. Atty. Gen., Frank J. Kelly, Atty. Gen., Appellate Div., Lansing, Mich., Anthony P. Hoang, Kenton W. Fulton, U.S. Dept. of Justice, Environment & Natural Resources Div., Gen. Litigation Section, Washington, D.C., for plaintiffs State of Mich., Mich. Dept. of Public Health, Mich. Low Level Radioactive Waste Authority, Mich. Dept. of Management and Budget, Mich. Natural Resources Com'n and Robert A. Bowman, Treasurer of State of Mich.
Thomas J. Gezon and Janice Kittel Mann, Asst. U.S. Attys., John A. Smietanka, U.S. Atty., Grand Rapids, Mich., Louise F. Milkman, U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Kenton W. Fulton, U.S. Dept. of Justice, Environment & Natural Resources Div., General Litigation Section, Washington, D.C., for defendants U.S., Samuel Skinner, as Secretary of Transp. and Richard Thornburgh, as U.S. Atty. Gen.

OPINION
BENJAMIN F. GIBSON, Chief Judge.
This case involves the constitutionality of the federal Low Level Radioactive Waste Policy Act of 1980 and the Act's 1985 amendments. 42 U.S.C. §§ 2021b et seq. In their seven-count complaint, plaintiffs State of Michigan et al. (collectively "plaintiff") object to implementation of the legislation on the ground that it violates Michigan's state sovereignty as guaranteed by the Tenth Amendment to the Constitution, the Guarantee Clause, Article IV, Section 4, as well as the state sovereignty "inherent in the formation, ratification, structure, and history of the United States Constitution." Complaint at 35. In addition, plaintiff has pled two causes of action allegedly arising under the National Environmental Protection Act. 42 U.S.C. §§ 4321 et seq. Presently pending is defendants United States of America et al.'s (collectively "defendant") motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. The parties have voluminously briefed the issues raised by the motion and a hearing was held before the Court on May 14, 1991.

I.
Since 1954 the federal government has promoted the use and development of atomic energy for non-military purposes through the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011 et seq. Low Level Radioactive Waste ("LLRW") is a hazardous by-product of nuclear power plants; the use of radioactive materials in medical diagnosis, treatment and research; and the production of consumer and industrial products. The majority of LLRW generated within the state of Michigan is generated at nuclear power plants which are licensed and regulated by the Nuclear Regulatory Commission, a federal agency.
There are currently three sites in the United States for the disposal of LLRW. *999 They are located in South Carolina, Washington, and Nevada. By the end of the 1970s it became clear that the nation needed additional disposal capacity. However, other states were very reluctant to create disposal facilities. In order to relieve the burden on the three sited states, in 1979 Congress began to consider federal solutions for the LLRW problem. In addition, the National Governor's Association ("NGA") established a task force to review and formulate state policy on the crisis. In 1980 the NGA produced a written report entitled Low Level Waste: A Program for Action ("NGA Report"). The report found that "the siting of a low-level nuclear waste facility involves primarily state and local issues which are best resolved at the governmental level closest to those affected." NGA Report at 1. Congress adopted the NGA's recommendations and, in 1980, enacted the LLRW Policy Act in order to give the states the direct responsibility for disposing of LLRW generated within their borders.[1]
The 1980 Act made each state responsible for providing for the availability of LLRW disposal capacity either within or outside the state. 42 U.S.C. § 2021d(a)(1). The 1980 Act did not provide any penalties but relied on cooperation by the states for its implementation. In 1985 Congress amended the 1980 Act to include the milestones and penalties complained of by Michigan in the present case.
The 1985 Policy Act puts teeth in the requirement that each state provide for the disposal of all LLRW generated within its borders. In this regard, Michigan was required to enact legislation and exercise its executive powers to implement the Policy Act. This included, among other things, rescinding a state law which prohibited the disposal of LLRW in Michigan, appointing LLRW officials, delegating LLRW responsibilities, and developing a siting plan for an LLRW facility.
The 1985 Policy Act also provides that, in order to carry out the intent of Congress, states may enter into interstate regional compacts to effectuate a cooperative disposal policy. Michigan entered into a compact with Iowa, Minnesota, Ohio, Indiana, Missouri, and Wisconsin ("the Midwest Compact"). In June of 1987 the Midwest Compact selected Michigan as the first state site for an LLRW disposal facility. As a result Michigan was required to site a disposal facility to accommodate the Midwest Compact members' LLRW. The disposal site must be able to safely contain class C LLRW for 500 years.
On or about July 24, 1991, while defendant's motion to dismiss was pending, Michigan was expelled from the Midwest Compact by vote of the other compact members.[2] However, this expulsion does not relieve Michigan of its responsibilities under the Act. The same deadlines and obligations apply to non-member states as to compacts. Accordingly, a cognizable case or controversy exists under the present facts.
Section 5(e) of the Policy Act sets forth the penalties to be applied to non-member states for failure to comply with the Act's milestones. If by January 1, 1992, Michigan fails to apply for a license to operate its own LLRW disposal facility, generators of LLRW in this state may have to pay a surcharge of up to $120 per cubic foot of LLRW disposed of at sites outside Michigan. This surcharge is designed to encourage states to take the required action. H.R.Rep. No. 314, 99th Cong., 1st Sess., Pt. 1 at 31 (1985).
Section 5(d)(2)(C)(ii) of the 1985 Policy Act provides that if a non-member state fails to provide for the disposal of all LLRW generated within that state by January 1, 1996, the state:
upon the request of the generator or owner of the waste, shall take title to the waste, be obligated to take possession of *1000 the waste, and shall be directly liable for all damages directly or indirectly incurred by such generator or owner as a consequence of the failure of the state to take possession of the waste ... [after] January 1, 1996.
Accordingly, unless Michigan either sites an LLRW disposal facility by 1996 or makes some other arrangement for the disposal of LLRW generated in Michigan, it will take title to all LLRW generated within its borders. The take title provision of the Policy Act is the major incentive provided by Congress to ensure that states comply with the law. It is also the major impetus for the present lawsuit. Plaintiff asserts that defendant is constitutionally precluded from requiring compliance with both the current milestones of the Policy Act as well as the 1996 take title requirement. It is also urged that the 1996 penalties are not merely a future possibility. Because of the long-term planning and budgetary concerns of siting an LLRW disposal facility, the state is required to make present allocations of resources in anticipation of the 1996 milestone.

II.
Defendant's motion to dismiss is brought pursuant to Federal Rule of Civil Procedure 12(b)(6). A motion under Rule 12(b)(6) tests whether a claim has been adequately stated in the complaint. The Court's inquiry at this point, before the reception of any evidence by affidavit or admission, is merely whether the challenged pleading sets forth allegations sufficient to make out the elements of a right to relief. In making this determination, the allegations in the pleading are taken at "face value", California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972), and should be construed favorably to the pleader. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). "[W]ell pleaded facts are taken as true, and the complaint is construed liberally in favor of the party opposing the motion." Davis H. Elliot Co. v. Caribbean Utilities Co., 513 F.2d 1176, 1182 (6th Cir.1975). All reasonable inferences which might be drawn from the pleading must be indulged. Fitzke v. Shappell, 468 F.2d 1072, 1076 n. 6 (6th Cir.1972). The court must deny the motion to dismiss unless it can be established beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Windsor v. The Tennessean, 719 F.2d 155, 158 (6th Cir.1983), cert. denied, 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984); Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957).
The Federal Rules of Procedure provide that if matters outside the pleadings are presented to the court, the court shall treat a motion to dismiss as one for summary judgment so long as the parties have been given the opportunity to present all material made pertinent to the motion. F.R.Civ.P. 12(b) and (c). In the present case both parties have presented evidence, especially regarding the State of Michigan's participation in the federal political process leading up to passage of the LLRW Policy Act. As discussed below, this issue of fact is paramount in deciding the constitutionality of the Act. To the extent the parties have presented matters outside the pleadings, the Court will treat defendant's motion as one for summary judgment.
Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); Atlas Concrete Pipe, Inc. v. Roger J. Au & Son, Inc., 668 F.2d 905, 908 (6th Cir.1982). There is no material issue of fact for trial unless, by viewing the evidence in favor of the nonmoving party, a reasonable jury could return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Boddy v. Dean, 821 F.2d 346, 349 (6th Cir.1987). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249, 106 S.Ct. at 2510 (citations omitted).
*1001 The party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a material issue of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); Potters Medical Center v. City Hospital Association, 800 F.2d 568, 572 (6th Cir.1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 322-24, 106 S.Ct. at 2552-53. If after adequate discovery the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim, summary judgment is appropriate. Id.

III.

CONSTITUTIONALITY OF THE ACT
Article IV, Section 4, of the Constitution provides:
The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the legislature, or of the Executive (when the legislature cannot be convened) against domestic violence.
The Tenth Amendment provides:
The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.
Plaintiff argues that the milestones and penalty provisions of the 1985 Policy Act intrude on its state sovereignty which is protected by the Guarantee Clause, the Tenth Amendment, and the structure of the United States Constitution. Michigan has the right as a sovereign to control its allocation of resources and direct the affairs of its state government. The 1985 Policy Act, however, mandates the state's responsibility in regard to the disposal of LLRW. The state cannot escape responsibility by forgoing federal funding for the LLRW program or forgoing regulation in the area. Cf. Nevada v. Skinner, 884 F.2d 445 (9th Cir.1989), cert. denied, 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990). In fact, there is nothing the state can do except comply with the 1985 Policy Act. Michigan argues that this amounts to an unconstitutional appropriation of the mechanisms of its state government by the federal government.
Defendant's response is that the Policy Act is a legitimate exercise of Congressional Commerce Clause power. In Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Supreme Court applied the minimum wage and overtime provisions of the Fair Labor Standards Act to employees of a municipally owned and operated mass transit system. Plaintiff had argued that application of this law to a state subdivision violated the Tenth Amendment's state sovereignty provision. By a 5-4 vote the Supreme Court overturned a nine-year old precedent, National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and decided that the commerce clause grants the federal government authority to regulate the states without regard to the nature of the state's activity.
National League of Cities stood for the proposition that the only limitation on federal regulation was the regulation of "states as states." In other words, the federal government was restricted from interfering with state functions which formed the fundamental elements of state sovereignty. National League of Cities, 426 U.S. at 845, 96 S.Ct. at 2471. The Garcia Court determined that the definition of "fundamental elements of state sovereignty" was too ambiguous to be relied on as a constitutional standard. In going out of its way to overturn National League of Cities, however, the Court did not go so far as to say that the concept of state sovereignty is invalid. In fact, the Court specifically held that the states do "retain a significant measure of sovereign authority." Garcia, 469 U.S. at 549, 105 S.Ct. at 1016-17, quoting EEOC v. Wyoming, 460 U.S. 226, 269, 103 S.Ct. 1054, *1002 1054, 75 L.Ed.2d 18 (1983) (Powell, J., dissenting).
Nevertheless, the Court determined that the best protection against federal interference in state sovereignty was the structure of the federal government itself. Because of the nature of Congress, the states' interests are assumed to be adequately protected by the fact that they participate directly in the national political process. The Court found that:
[T]he fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect the "States as States" is one of process rather than result. Any substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a "sacred province of state autonomy."
Id. at 554, 105 S.Ct. at 1019 (citation omitted).
This language makes it clear that there are no identifiable limits on the scope of Commerce Clause regulation. The only challenge available to federal regulation of the states is that the national political process is defective. Again, as the Court stated, "The political process ensures that laws that unduly burden the States will not be promulgated." Id. at 556, 105 S.Ct. at 1020. Beyond this finding, though, the Supreme Court's guidance on this issue is somewhat ambiguous. After satisfying itself that the political process had performed as intended in Garcia, the Court specifically declined to "identify or define what affirmative limits the constitutional structure might impose on federal action affecting the States under the Commerce Clause." Id.
Michigan argues that the political process was defective in regard to the LLRW legislation because three states, South Carolina, Washington, and Nevada, held an inordinate amount of power and political clout in getting the law passed. These states threatened to close their borders to LLRW and touch off a national crisis unless Congress undertook a comprehensive plan for the disposal of LLRW. Likewise, Congress avoided accountability by not appropriating any federal money for the program. The states are required to implement the program with the only incentive being avoidance of the take title provision. Finally, the NGA Report which served as a basis for the 1980 Policy Act did not contain the milestones and penalty provisions provided for in the 1985 Policy Act. Plaintiff argues that this evidences the failure of Congress to fully account for the states' concerns.
Given the language of Garcia, plaintiff's argument must fail. There is ample evidence in the record that Michigan's senators and representatives participated in the floor debate and even urged passage of this legislation. Senator Levin, arguing in favor of passage of the Act, stated:
[T]his legislation is very important to all States including Michigan who must do something to properly dispose of the low-level radioactive waste within their borders. It is important to all of us that this waste be properly disposed of.... I would not stand in the way of passage of this legislation.
131 Cong.Rec. 38,422 (1985). Likewise, Congressman Dingell served as chairman of the House Energy and Commerce Committee and was active in his support of the House bill, including the take title provisions. See id. at 38,118. Moreover, Michigan participated in the NGA which contributed to the blueprint for this legislation. Although the NGA Report was not adopted in toto, it clearly served as a benchmark for federal action. In fact, with the legislation's emphasis on state control over LLRW disposal, it is arguable that the political process worked to the considerable advantage of the various states. After recognizing the crisis in LLRW disposal, the mechanism for providing disposal capacity was left in the hands of the states.[3]
*1003 The Court cannot reasonably undertake the analysis urged by Michigan in regard to the excessive political clout wielded by the three sited states. There is no gauge for measuring by what forms and degrees of political persuasion the constitution's framers intended the national political process to function. Certainly, in every piece of legislation affecting the states, various states stand to gain more or less than other states. To attempt to weigh the proper proportion of influence to be wielded by the states would send the Court careering down a path that has never been illuminated and that flies in the face of the Garcia Court's concern with maintaining a workable analytical framework.[4] The legislative history indicates that the federal political process did not malfunction, and implementation of the 1985 Policy Act was a legitimate exercise of federal Commerce Clause regulatory authority.[5]

NATIONAL ENVIRONMENTAL POLICY ACT
The National Environmental Protection Act ("NEPA") requires that all agencies of the federal government prepare an Environmental Impact Statement ("EIS") whenever the agency contemplates taking major federal action which may significantly affect the quality of the human environment. An EIS is a detailed statement concerning the environmental impact of the proposed action, avoidable adverse environmental effects, alternatives to the proposed action, the relationship between local, short-term uses of the environment and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332.
In its complaint, plaintiff alleges that the NRC's 1982 EIS analyzed, on a regional basis, only four hypothetical regional operating LLRW disposal facilities for the purpose of identifying the environmental consequences of its then proposed Part 61 Regulations (Licensing Requirements for Land Disposal Facilities of Radioactive Waste, 10 C.F.R. Part 61). These regulations establish the licensing requirements that apply to LLRW disposal. Because the 1985 Policy Act places disposal responsibility on the states, the Part 61 Regulations directly impact states which are required to site disposal facilities under the Policy Act.
Plaintiff asserts that the amount of LLRW produced in the country since 1982 has significantly decreased and the number of proposed disposal facilities has increased by at least threefold resulting in less need for each state to provide for disposal of its own LLRW. Further, plaintiff alleges that the NRC has a continuing duty to gather and evaluate new information relevant to the 1982 EIS. It requests that the NRC be required to supplement its 1982 EIS in light of the decreased production of LLRW and the increased future availability of LLRW disposal sites throughout the country. Plaintiff also requests that the NRC prepare a programmatic EIS considering the environmental impact of all potential LLRW facilities because their development is a major federal action significantly affecting the environment.
Defendant's position is that jurisdiction over challenges to an EIS promulgated under NEPA lies in the Court of Appeals, so *1004 this Court has no jurisdiction. By challenging the NRC's 1982 EIS, plaintiff is implicitly challenging the Part 61 Regulations which were enacted pursuant to that EIS. Title 42 United States Code Section 2239(a) provides that challenges to administrative orders of the NRC must be brought before the NRC for an initial proceeding. Section 2239(b) provides that appeals from the initial proceedings are subject to judicial review under the Hobbes Act. The Hobbes Act vests jurisdiction over final orders of the NRC in the United States Court of Appeals. 28 U.S.C. § 2342(4).
There does not appear to be any statutorily mandated channel of review for an existing EIS. In fact, the Court is not aware of any other cases in which plaintiff has sought to require an administrative agency to amend an EIS upon which it has based regulations. Plaintiff argues that this leaves the Court's jurisdiction intact pursuant to the general grant of federal jurisdiction contained in Title 28 United States Code Sections 1331 and 1361.[6]
This argument fails to satisfy even more basic prerequisites to federal jurisdiction, though. It does not appear that plaintiff's request is embodied in a case or controversy as required by Article III of the Constitution. NEPA states, in pertinent part:
(b) In order to carry out the policy set forth in this act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate federal plans, functions, programs and resources.
42 U.S.C. § 4331(b). While this language arguably requires NRC to implement and update the 1982 EIS when warranted, there is no indication from the complaint, or from the arguments made before the Court, that plaintiff is in any way injured by defendant's alleged failure to amend the EIS. The NRC does not owe plaintiff a specific duty to supplement the 1982 EIS and plaintiff cannot establish that Congress intended to grant any person or state standing to sue the NRC based on an alleged failure to properly implement the NEPA. In fact, the only plausible way to read plaintiff's complaint as attempting to redress an injury or breach of a duty owed is to read it in the light suggested by defendant. Plaintiff's injury, if any, arises from implementation of the Part 61 Regulations. They embody the only action taken which directly touches upon plaintiff's responsibilities.
This reading of plaintiff's NEPA claims is bolstered by paragraph 151 of plaintiff's complaint, which states:
The proliferation of LLRW Disposal Facilities and reduction in projected volumes of LLRW has a direct bearing on the impacts of the NRC Part 61 Regulations, including, but not limited to, long-term radiological impacts such as erosional impacts or ground water impacts.... These impacts on the regulations mandate that the 1982 EIS be supplemented.
Complaint at 47-48 (emphasis added). The emphasized language clarifies that plaintiff's real concern is with the Part 61 Regulations. These regulations set forth the requirements states must meet in developing LLRW disposal facilities. In order to challenge the regulations plaintiff must petition the NRC and seek judicial review in the court of appeals. Plaintiff cannot avoid these jurisdictional requirements by challenging the EIS that underlies the Part 61 Regulations. See e.g. Atlanta Gas Light Co. v. Southern Natural Gas Co., 338 F.Supp. 1039, 1050 (N.D.Ga.1972) (Federal Power Commission must determine appropriateness of EIS under NEPA, with exclusive review in Court of Appeals), aff'd in part and vacated in part, 476 F.2d 142 (5th Cir.1973).

*1005 IV.
For the reasons stated above, defendants United States of America et al.'s motion to dismiss is granted.
NOTES
[1] The legislative history of the 1985 Act indicates that the 1980 Act was designed to reflect the recommendation of South Carolina, Washington, Nevada, the National Conference of State Legislatures, the NGA, and the President's State Planning Council on Radioactive Waste Management. H.R.Rep. 314, 99th Cong., 1st Sess., Part 2 at 18.
[2] The Court takes judicial notice of this fact.
[3] Following Garcia, it is likely that Congress could have explicitly required certain states to develop disposal sites, or the federal government could have developed such sites in the states of its choosing. Instead, the states were given considerable control in exercising the national LLRW disposal policy.
[4] Undertaking this analysis might also lead to the Court entering into the area of political decisions, where it is steadfast in its determination not to go. If the State of Michigan perceives that the political process is somehow unfair, its best remedy is to work to change that process. The Court cannot use the wisdom of hindsight or empathy with a "minority" state to rewrite legislation that was validly enacted.
[5] The above analysis applies to all arguments raised by plaintiff in regard to the constitutionality of the Policy Act. Regardless of the basis for its state sovereignty (i.e., the Guarantee Clause, the tenth amendment, or some other constitutional provision), Congress may intrude on the state's activity so long as the political process remains effective. See New York v. United States, 757 F.Supp. 10 (N.D.N.Y.1990) (holding of Garcia precludes district court from defining the contours of state sovereignty in relation to the LLRW Policy Act), aff'd, 942 F.2d 114 (2nd Cir.1991).
[6] Section 1331 grants the district courts jurisdiction over civil actions arising under federal law. Section 1361 grants the district courts jurisdiction over actions "in the nature of mandamus to compel an officer or employee of the United States or an agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361 (emphasis added). As discussed below, plaintiff cannot show that the NRC's alleged failure to supplement the 1982 EIS in any way breaches a duty owed plaintiff.