UNITED GAS PIPE LINE CO. *v.* MEMPHIS LIGHT,
GAS AND WATER DIVISION ET AL.

No. 23.   Argued October 20–21, 1958,—Decided December 8, 1958.*

*Ralph M. Carson* argued the causes for petitioners in
Nos. 23 and 26.   With him on the brief for petitioner in
No. 23 were *Thomas Fletcher, C. Huffman Lewis, Morton*

*Together with No. 25, *Federal Power Commission* v. *Memphis
Light, Gas and Water Division et al.,* and No. 26, *Texas Gas Trans-
mission Corp. et al.* v. *Memphis Light, Gas and Water Division et al.,*
also on certiorari to the same Court.

*E. Yohalem* and *James J. Higginson.* On the brief for petitioners in No. 26 were *John T. Cahill* for the Texas Gas Transmission Corporation, *William S. Tarver* for the Southern Natural Gas Co., and *Richard J. Connor* and *Daniel James,* of counsel.

*Solicitor General Rankin* argued the cause for the Federal Power Commission. With him on the brief were *Willard W. Gatchell* and *William W. Ross.*

*George E. Morrow* and *Reuben Goldberg* argued the causes and filed a brief for the Memphis Light, Gas and Water Division et al., respondents.

Briefs of *amici curiae* urging affirmance in Nos. 23, 25 and 26 were filed by *Everett C. McKeage* for the State of California et al., *Joe T. Patterson,* Attorney General, and *Wade H. Creekmore,* Assistant Attorney General, for the State of Mississippi, *George F. McCanless,* Attorney General, and *Allison B. Humphreys,* Solicitor General, for the State of Tennessee, *Stewart G. Honeck,* Attorney General, and *Roy G. Tulane,* Assistant Attorney General, for the State of Wisconsin, *John J. O'Connell,* Attorney General, and *Frank P. Hayes,* Assistant Attorney General, for the State of Washington, *Garner W. Green* for the City of Hattiesburg, Mississippi, and *Roger Arnebergh, John C. Banks, Peter Campbell Brown, J. Elliott Drinard, Marshall F. Hurley, J. Frank McKenna, John C. Melaniphy, Charles S. Rhyne* and *J. Parker Connor* for the Member Municipalities of the National Institute of Municipal Law Officers.

Mr. Justice Harlan delivered the opinion of the Court.

We review a judgment of the Court of Appeals for the District of Columbia Circuit which directed the Federal Power Commission to reject certain rate schedules for

natural gas filed with it by petitioner United Gas Pipe Line Company (United) under § 4 (d) of the Natural Gas Act of 1938, 52 Stat. 821, as amended, 15 U. S. C. § 717 *et seq.*

United, a regulated natural gas pipeline company, supplies gas to Texas Gas Transmission Corporation (Texas Gas), Southern Natural Gas Company (Southern Gas), and Mississippi Valley Gas Company (Mississippi),[1] under a number of long-term service agreements made and filed with the Commission prior to September 30, 1955, each of which contains the following pricing provision: [2]

> "All gas delivered hereunder shall be paid for by Buyer under Seller's Rate Schedule [the appropriate rate schedule designation is inserted here], *or any effective superseding rate schedules,* on file with the Federal Power Commission. This agreement in all respects shall be subject to the applicable provisions of such rate schedules and to the General Terms and Conditions attached thereto and filed with the Federal Power Commission which are by reference made a part hereof." (Italics supplied.)

---

[1] Mississippi, a natural gas distributing company, also purchases gas from Texas Gas and Southern Gas. Respondent Memphis Light, Gas and Water Division, an agency of the City of Memphis engaged in the distribution of natural gas, purchases gas from Texas Gas, and has no direct contract relations with United. However, it is obligated to reimburse Texas Gas for any increase in the latter's cost of gas acquired from United.

[2] Originally there were seven such agreements, of which five contained the provision quoted in the text. However, the other two were found by the Commission, and assumed by the Court of Appeals, to contain the equivalent of that provision, and one of the two was replaced by a superseding agreement explicitly containing the provision very shortly after the filing here at issue.

On September 30, 1955, United, proceeding under § 4 (d) of the Natural Gas Act, filed with the Commission new rate schedules, together with supporting data, increasing its prices for gas as of November 1, 1955, by amounts estimated to yield total additional annual revenues of $9,978,000 from sales under the agreements here involved and from other sales also subject to the Commission's jurisdiction. Exercising its powers under § 4 (e) of the Act, the Commission ordered a hearing as to the propriety of the new rates, and, except as to those relating to sales of gas for resale for industrial use only, suspended their effectiveness from November 1, 1955, to April 1, 1956, the maximum period of suspension authorized by the statute.[3] Thereafter Texas Gas, Southern Gas, Mis-

---

[3] Sections 4 (d) and 4 (e) of the National Gas Act read as follows:

§ 4 (d): "Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such [filed] rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published."

§ 4 (e): "Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, or State commission, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or

sissippi, Memphis, and others claiming an interest in the proceedings were permitted to intervene; and on February 6, 1956, the Commission commenced the taking of evidence as to the lawfulness of United's new rates under the "just and reasonable" standard of § 4 (e).

On February 27, 1956, this Court announced its decision in *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.,* 350 U. S. 332, in which it was held that United could not escape a contract obligation to furnish Mobile with natural gas at a single specified price for a term of

---

service, but not for a longer period than five months beyond the time when it would otherwise go into effect: *Provided,* That the Commission shall not have authority to suspend the rate, charge, classification, or service for the sale of natural gas for resale for industrial use only; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible."

The Commission did not suspend the rates applicable to sales for resale for industrial use only, as it has always taken the view that under the statute it is without power to suspend the effectiveness of these rates.

years by unilaterally filing an increased rate schedule under § 4 (d) of the Natural Gas Act. Following that decision the respondents in the present case for the first time moved the Commission to reject United's new rate schedules, claiming that their filing constituted an attempt on the part of United to change unilaterally the terms of its service agreements with Texas Gas, Southern, and Mississippi, and that such an attempt ran afoul of our decision in *Mobile*. Construing these agreements as in effect constituting undertakings by the purchasers to pay United's "going" rates, as established from time to time in accordance with the procedures prescribed by the Natural Gas Act, the Commission refused to reject United's filings. It distinguished *Mobile* on the ground that the contract there involved specified a single fixed rate for the gas to be supplied under it which United was contractually foreclosed from changing without the agreement of the purchaser. 16 F. P. C. 19, 15 P. U. R. 3d 279.

The Court of Appeals reversed. Accepting for the purposes of its decision the Commission's interpretation of United's service agreements, the Court of Appeals held that nonetheless the Commission lacked "jurisdiction" to consider under § 4 (e) the lawfulness of United's new rate schedules. The court regarded *Mobile* as establishing that § 4 (e) applies only to rate changes whose *specific amount* has been mutually agreed upon between a seller and purchaser, and that where a purchaser has not so agreed, a rate change can be effected only by action of the Commission under § 5 (a) of the Act.[4] Since the rates

---

[4] § 5 (a): "Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or

set forth in United's new schedules had not been agreed to by its customers, the Court of Appeals therefore held that the Commission had no jurisdiction to proceed under § 4 (e) to examine them, and that accordingly United's filings under § 4 (d) should have been rejected. 102 U. S. App. D. C. 77, 250 F. 2d 402. We granted certiorari because of the claim that the Court of Appeals misinterpreted our decision in *Mobile,* and on the suggestion that its judgment seriously frustrates the proper administration of the Natural Gas Act. 355 U. S. 938.

It is apparent that the Court of Appeals misconceived the import of our decision in *Mobile.* The contract before the Court in that case required United to furnish natural gas to Mobile at a single fixed price of 10.7 cents per MCF (thousand cubic feet) for a period of 10 years. The contract contained no provision for any different rate, or for changing the agreed rate during the term of the agreement. It was argued by United that the Natural Gas Act gave it the right to abrogate this unqualified contract obligation and increase at will its price of gas to Mobile by filing new rate schedules under § 4 (d), subject only to the Commission's approval of such schedules under § 4 (e). In rejecting that contention this Court held that the Natural Gas Act, unlike the Interstate Commerce Act, "evinces no purpose to abrogate private

---

that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, régulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates."

rate contracts as such," that the Act did not "empower natural gas companies to change their contracts unilaterally," and that in this respect regulated natural gas companies stood in no different position under the Act than they would have in the absence of the Act. 350 U. S., at 338, 340, 343. Since United had contractually bound itself to furnish gas to Mobile throughout the contract term at a particular price, we held that its obligation could be abrogated only by the Commission, in the exercise of its paramount regulatory authority under § 5 (a). *Ibid.*, at 344–345.

The United contract now before us, as construed by the Federal Power Commission and as viewed by the Court of Appeals for the purposes of decision, is vitally different from that in *Mobile*. On this view of the contract United bound itself to furnish gas to these customers during the life of the agreements *not* at a single fixed rate, as in *Mobile*, but at what in effect amounted to its current "going" rate. Contractually this left United free to change its rates from time to time, subject, of course, to the procedures and limitations of the Natural Gas Act. In such circumstances there is nothing in *Mobile* which suggests that United was not entitled to file its new schedules under § 4 (d), or that the Commission had no jurisdiction to consider them under § 4 (e). On the contrary we said in *Mobile* (350 U. S., at 343):

> ". . . except as specifically limited by the Act, the rate-making powers of natural gas companies were to be no different from those they would possess in the absence of the Act: to establish *ex parte,* and change at will, the rates offered to prospective customers; or to fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer. No more is necessary to give full meaning to all the provisions of the Act: consistent

with this, § 4 (d) means simply that *no* change—neither a unilateral change to an *ex parte* rate nor an agreed-upon change to a contract—can be made by a natural gas company without the proper notice to the Commission. . . ."

The Court of Appeals therefore erred in reading *Mobile* as limiting the procedures prescribed by § 4 (d) and (e) to instances where the parties by mutual agreement had "reformed" a rate contract. The reason these procedures were unavailable to United in *Mobile* was because the company had bargained away by contract the right to change its rates unilaterally, and not because § 4 does not apply to such rate changes whether made pursuant to or in the absence of a contract.

Moreover, we find nothing in the scheme of the Natural Gas Act which would justify the restrictive application which the Court of Appeals' decision gives to § 4 (d) and (e). Section 4 (c) requires every natural gas company initially to file with the Commission its rates for any "sale subject to the jurisdiction of the Commission, . . . together with all contracts which in any manner affect or relate to such rates . . . ." Section 4 (d) provides for the giving of notice of any change "in any such rate . . . or contract relating thereto . . ." by filing new rate schedules with the Commission and keeping them open for public inspection.[5] And § 4 (e) authorizes Commission review of the lawfulness of any such changed rate.[6] The record before us affirmatively shows that United in the filings here at issue has complied with all the duties which these sections in terms impose upon it, and there is nothing in these sections which even remotely implies that § 4 (d) and (e) procedures are applicable to

---

[5] See note 3, *supra.*

[6] See note 3, *supra.*

the filing and review of only those rate changes whose amount has been agreed upon by the seller and buyer.[7]

The important and indeed decisive difference between this case and *Mobile* is that in *Mobile* one party to a contract was asserting that the Natural Gas Act somehow gave it the right unilaterally to abrogate its contractual undertaking, whereas here petitioner seeks simply to assert, in accordance with the procedures specified by the Act, rights expressly reserved to it by contract. *Mobile* makes it plain that "§ 4 (d) on its face indicates no more than that *otherwise valid* changes cannot be put into effect without giving the required notice to the Commission." 350 U. S., at 339–340. (Italics supplied.) The necessary corollary of this proposition is that changes which in fact are "otherwise valid" in the light of the relationship between the parties can be put into effect under § 4 (d) by a seller through giving the required notice to the Commission. *Mobile* expressly notes that in the absence of any contractual relationship rates determined *ex parte* by the seller may be filed under § 4 (d). 350 U. S., at 343. We perceive no tenable basis of dis-

---

[7] A majority of the court below thought that such a limitation should be imported into the Act to fend against "debilitating Section 5 (a)" by making it possible for a seller to reserve by contract the right to avoid "the delay and the more stringent proof requirements of Section 5 (a)" through utilizing § 4 procedures. 102 U. S. App. D. C., at 82, note 3, 250 F. 2d, at 407, note 3. Apart from the fact that this approach seems to assume a negative answer to the very question at issue—whether Congress intended that natural gas companies should be permitted, so far as the statute is concerned, to file rate changes under § 4 (d) without securing prior customer agreement to the changed rate—it may be pointed out that the Commission appears consistently to have viewed the proof requirements under §§ 4 (e) and 5 (a) as equally "stringent." See FPC, Thirty-fifth Annual Report (1955), at 106; Thirty-fourth Annual Report (1954), at 106; Thirty-third Annual Report (1953), at 99.

tinction between the filing of such a rate in the absence of contract and a similar filing under an agreement which explicitly permits it.

Thus *Mobile,* properly understood, affirmatively establishes United's right to proceed under § 4 in the circumstances of this case. As we there said, "The initial rate-making and rate-changing powers of natural gas companies remain undefined and unaffected by the Act." 350 U. S., at 343. United, like the seller of an unregulated commodity, has the right in the first instance to change its rates as it will, unless it has undertaken by contract not to do so. The Act comes into play as to rate changes only in (1) imposing upon the seller the procedural requirement of filing timely notice of change, (2) giving the Commission authority to review such changes, and (3) authorizing the Commission, in the case of rates for sales of gas for other than exclusively industrial use, to suspend the new rates for a five-month period and thereafter to require the posting of a refund bond pending a determination of the lawfulness of the rates as changed. (See § 4 (d), (e), at note 3, *supra.*)

It seems plain that Congress, in so drafting the statute, was not only expressing its conviction that the public interest requires the protection of consumers from excessive prices for natural gas, but was also manifesting its concern for the legitimate interests of natural gas companies in whose financial stability the gas-consuming public has a vital stake. Business reality demands that natural gas companies should not be precluded by law from increasing the prices of their product whenever that is the economically necessary means of keeping the intake and outgo of their revenues in proper balance; otherwise procurement of the vast sums necessary for the maintenance and expansion of their systems through equity and debt financing would become most difficult, if not impossible. This concern was surely a proper one for Congress

to take into account in framing its regulatory scheme for the natural gas industry, cf. *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U. S. 591, 603, and we think that it did so not only by preserving the "integrity" of private contractual arrangements for the supply of natural gas, 350 U. S., at 344 (subject of course to any overriding authority of the Commission), but also by providing in § 4 for the earliest effectuation of contractually authorized or otherwise permissible rate changes consistent with appropriate Commission review.

What has been said disposes of the question whether anything in the Natural Gas Act forbids a seller to change its rates pursuant to § 4 procedures simply because its customers have not agreed to the amount of the rate as changed. There remains the question whether United's service agreements reserved to it the power to make rate changes in this manner. The Commission found that the agreements so intended, but on its view of the case the Court of Appeals found it unnecessary to decide the question. We think it would be both unnecessary and dilatory for us to remand the case to the Court of Appeals for consideration of that issue, which involves matters peculiarly within the area of the Commission's special competence and as to which we could hardly be aided by a further examination of the record by the Court of Appeals. Indeed neither side suggests such a course, even alternatively, both asking us to decide the case in its present posture.

After scrutinizing the record we are satisfied that the Commission's determination as to the meaning of the service agreements here involved was amply supported both factually and legally. There is no necessity for us to embark upon a detailed discussion of the various contentions made by the parties, none of which appears to have been overlooked or misapprehended by the Commission. It seems sufficient to say that the record shows

that these agreements are typical of the "tariff-and-service" arrangements contemplated by Commission Order. No. 144, 18 CFR § 154.1 *et seq.*;[8] that until this case no one connected with the industry seems to have thought that agreements of this sort precluded natural gas companies from changing their rates in accordance with and subject to § 4 (d) and (e) procedures;[9] and that the respondents' present contrary contentions had their sole genesis in a mistaken view of our decision in the *Mobile* case. Beyond this, we find nothing in these agreements, as interpreted by the Federal Power Commission, which is hostile to any of the provisions or purposes of the Natural Gas Act.[10]

---

[8] When the Natural Gas Act became law in 1938, natural gas companies were permitted to file their existing sales contracts as rate schedules under § 4 (c). Schedules in this form were extremely lengthy, unwieldy, and otherwise unsatisfactory in that it was most difficult for customers, competitors, and the Commission itself to ascertain whether rates to various customers were unduly discriminatory or otherwise unreasonable. The Commission therefore proposed regulations requiring the conversion of rate contracts into a "tariff-and-service-agreement" system, and these regulations were promulgated in October 1948 as Order No. 144. Under the tariff-and-service-agreement system, the agreement between buyer and seller does not itself contain a price term, but rather refers to rate schedules of general applicability on file with the Commission. It is noteworthy that Order No. 144 expressly contemplates that a seller may reserve the "privilege" of filing rate changes under § 4 of the Act. 18 CFR § 154.38 (d) (3).

[9] Between the date of the *Mobile* decision and that of the court below it appears that only three purchasers of natural gas under service agreements similar to those here involved (one of them Mississippi, a respondent here) moved to dismiss changed rate schedules on the ground that the agreements did not permit their filing, although some 600 such purchasers were affected by rate changes filed during that period.

[10] Respondents argue that the "effective superseding rate" clause of the agreements must be read as referring only to superseding rates established after a § 5 (a) proceeding, because it would be unreason-

For the reasons given we hold that the Court of Appeals was in error in concluding that in the circumstances of this case United could not proceed to change its rates by filing under § 4 (d) of the statute.

*Reversed.*

MR. JUSTICE CLARK took no part in the consideration or decision of these cases.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK concur, dissenting.

This decision marks, I think, a retreat from our holding in *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.,* 350 U. S. 332. In every case the facts are, of course, different from those in the precedents. But here the dif-

---

able to find that the buyer-signatories to the agreements had intended to authorize United to change its "industrial" rates by a § 4 (d) filing in light of the fact that such rates are not subject to suspension and refund under the statute. Apart from the circumstances that (1) United's "industrial" sales under these agreements appear to have been a relatively minor factor; (2) the clause would be entirely superfluous if construed as respondents would have it, since as a matter of law rate changes ordered by the Commission after a § 5 (a) proceeding would have been incorporated into the agreements, *Northern Pacific R. Co.* v. *St. Paul & Tacoma Lumber Co.,* 4 F. 2d 359 (C. A. 9th Cir. 1925), appeal dismissed, 269 U. S. 535; *Market Street R. Co.* v. *Pacific Gas & Electric Co.,* 6 F. 2d 633 (D. C. N. D. Cal. 1925), appeal dismissed, 271 U. S. 691; and (3) the "industrial" rates of United have consistently been below its other rates, the force of respondents' contention is wholly destroyed by the fact that it appears that the buyer-signatories to the agreements are entitled by contract with their customers to pass on any rate increases effected by United. Under these circumstances it can hardly be said to be inconceivable, or even unlikely, that the buyers would have been willing to authorize United to change its "going" rates to them under § 4 (d).

ference does not seem to me to be fundamental. The contract rate in the *Mobile* case which was sought to be changed unilaterally was fixed in a service agreement. Here the contract rate which was changed unilaterally was in the seller's rate schedule on file with the Commission.[1]

I thought the essence of our ruling in the *Mobile* case was in the words: "the Natural Gas Act does not empower natural gas companies unilaterally to change their contracts." 350 U. S., at 344. That was emphasized over and again especially in the discussion of when unilateral and bilateral changes in rates were permissible:

> "to establish *ex parte,* and change at will, the rates offered to prospective customers; or to fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer." 350 U. S., at 343.

Like the judges of the Court of Appeals, I thought that this meant that all § 4 (d) rates had to be rates agreed upon by the parties to the contract. That is the reason, I thought, why Congress made the control of the Commission over such rates so slight. That the supervision is restricted is evidenced by two elements in § 4 (e): *first,* the Commission can suspend those agreed-

---

[1] At the time the contract in *Mobile* was entered into the industry practice was to set rates in the service contracts which were filed with the Commission as the rate schedules. But in 1948 the Commission promulgated Order 144 requiring the conversion of all rate contracts into tariff-and-service agreement form. From that time on rates have not been included in the service contracts; rather, they are included in rate schedules of general applicability on file with the Commission to which reference is made in the individual service agreements. See 18 CFR § 154.1 *et seq.* Hence the difference in the price provision in the contracts involved here from that involved in *Mobile.*

upon changes for no more than five months; *second,* no power of suspension whatsoever is given to rates "for resale for industrial use only."[2]

But now we are told that the requirement of bilateral rate making is satisfied by the provision in the contract that the controlling rate is the "effective" rate and an "effective" rate is one which the selling company alone chooses to fix and file under § 4.

I find insuperable difficulties with that view. The contract does not say that the buyer will consent to any rate increase which the seller may file. It is an agreement to pay whatever may be the "effective" rate; it is not an agreement to the establishment of that new rate. The construction of this tariff is a question of law (see *Great No. R. Co.* v. *Merchants Elev. Co.,* 259 U. S. 285, 290) which we should resolve in light of the regulatory system that Congress has imposed on the industry.

The construction adopted by the Court has dire consequences. It makes a shambles of the Act so far as con-

---

[2] Section 4 (e) provides in part:

"Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, or State commission, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect: *Provided,* That the Commission shall not have authority to suspend the rate, charge, classification, or service for the sale of natural gas for resale for industrial use only . . . ."

sumer interests are concerned; and they are the ones the Act was designed to protect.[3] The ruling sacrifices these interests in the cause of those who exploit this field. Now the regulatory agency is left powerless to prevent a selling company, after the 30-day waiting period, from making consumers pay immediately whatever rate the company fixes. There is power in the Commission to suspend the new rate for five months; but in case of industrial rates even that limited power of suspension is absent. If the Commission should ultimately decide in a § 4 (e) proceeding that the new rates are not just and reasonable, the victory for the consumers may be an illusory one, for administrative difficulties make it doubtful that they will receive the benefit of any refunds.[4] And if the increases are in industrial rates, it appears that the Commission has no authority to require a refund of any unjustified increase collected before its order setting aside the increase. Even when the Commission catches up with the new high rate fixed by the selling company at its will and strikes it down, its action promises to have only a fleeting effect. The pipeline company can now in its unfettered discretion raise the rates again simply by

[3] See *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U. S. 591, 610. Protection of the consumer interest was to be done through occupying a field from which the States had been barred. H. R. Rep. No. 709, 75th Cong., 1st Sess., p. 2.

[4] In its 1953 report to Congress the Commission recognized that "the collection of higher rates under bond, while providing protection to the pipeline company against ultimate loss in revenues, is unsatisfactory, burdensome, and presents many difficult problems for the company as well as for the distribution utilities which must pay the higher rates. The problem of distributing impounded funds to consumers in the event that proposed rate increases are denied even in part is time-consuming and expensive." Report, Federal Power Commission, 1953, p. 101.

filing a new rate; and if it is an industrial rate, it cannot even be suspended.[5]

I would not construe the Act so as to produce such destructive consequences. I would allow the § 4 rates to embrace only the "rates agreed upon" by the pipeline and the customer, as we stated in the *Mobile* case, applying § 5 to all other cases. I fear that our failure to do so turns the real regulation over to the pipeline companies. I cannot imagine that the Congress that passed this Act envisaged any such tragic result for consumers; and we are not driven to it by unambiguous terms of the Act.

---

[5] As stated by the State of Washington, *amicus curiae,* "By the legally available expedient of filing another schedule of increased rates under § 4 (d), any relief obtained by a Commission order after review could be effectively nullified 30 days after it was obtained."