METROPOLITAN EDISON
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Borough of Middletown, Pennsylvania,
Intervenor.

No. 76–1866.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 23, 1978.

Decided March 8, 1979.

---

James B. Liberman, Washington, D. C., with whom Albert R. Simonds, Jr., Washington, D. C., was on the brief, for petitioner.

M. Frazier King, Jr., Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, Allan Abbot Tuttle, Sol., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondent. Philip R. Telleen, Atty., Federal Energy Regulatory Commission, Washington, D. C., also entered an appearance for respondent.

Philip P. Ardery, Louisville, Ky., was on the brief for intervenor.

Before ROBINSON, ROBB and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

Dissenting opinion filed by Circuit Judge WILKEY.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

We address on this review an electric utility's claim of discrimination assertedly requiring upward revision of a wholesale rate otherwise shielded against unilateral alteration by the well-known *Mobile-Sierra* doctrine.[1] Metropolitan Edison Company (Met-Ed) seeks reversal of an order[2] of the Federal Power Commission[3] repulsing its effort under Section 206(a) of the Federal Power Act[4] to bypass a contract in terms obligating it to furnish power to the Borough of Middletown, Pennsylvania, at a fixed rate. We find the Commission's disposition unimpeachable and accordingly affirm.

I

In 1906, York Haven Water & Power Company, Met-Ed's corporate predecessor, contracted to supply Middletown's electrical requirements in their entirety[5] at a rate of one cent per kilowatt hour.[6] The contract's penultimate paragraph is of great significance in this litigation. It states:

Inasmuch as the Borough is practically abandoning its present electric light plant at great loss to itself and has been induced by the Company to use the electricity and electric power of the Company as

1. See *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). See also *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div.*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958). For further discussion of the *Mobile-Sierra* doctrine, see additional cases cited *infra* notes 27–28, 38.

2. *Metropolitan Edison Co.*, (Opinion No. 764) (F.P.C. June 1, 1976), *rehearing denied,* F.P.C. No. E–8832 (July 30, 1976) (unreported), Joint Appendix (J.App.) 72, 78.

3. Pursuant to the Department of Energy Organization Act, Pub.L. No. 95–91, § 402(a), 91 Stat. 565 (1977), 42 U.S.C.A. § 7172(a) (West Supp. 1977), most of the functions of the Federal Power Commission have been transferred to the Federal Energy Regulatory Commission. Under §§ 705(c)–(e) of the Act, 42 U.S.C.A. §§ 7295(c)–(e) (West Supp.1977), judicial proceedings commenced prior to its effective date

are unaffected save for substitution of appropriate parties.

4. Section 206(a), 16 U.S.C. § 824e(a) (1976), provides:

Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affected [*sic*] such rate, charge, or classification is unjust, unreasonable, and unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

5. J.App. 49.

6. J.App. 50.

a matter of economy and advantage to the Borough, it is agreed that this contract shall continue in full force indefinitely until terminated by the Borough upon six months' notice in writing to the Company.[7]

Met-Ed first voiced dissatisfaction with the Middletown agreement in 1971—65 years after its execution. By then, rising fuel costs were about to turn the once remunerative pricing provision into a losing proposition for Met-Ed, a consequence likely to worsen with the passage of time. In 1972, Met-Ed's revenues from its Middletown service were $368,990, some $9,000 less than corresponding operating expenses.[8] Those revenues were as much as $294,189 less than Met-Ed would have derived had Middletown been charged the same rate as Kutztown, Pennsylvania, a Met-Ed wholesale customer akin to Middletown in type and quantity of service provided.[9] However, though hardly a boon to Met-Ed's growth, the shortfalls generated by the Middletown contract presently pose no threat to the company's financial health and stability. In 1972, when Met-Ed lost $9,000 on Middletown, its overall revenues exceeded total operating costs by some $33 million,[10] and in the next year total income outpaced costs by more than $36 million.[11]

In 1974, Met-Ed petitioned the Commission for an investigation of the Middletown arrangement with a view toward an increase of the one-cent rate.[12] The Commission instituted the requested proceeding,[13] which progressed to a hearing before an administrative law judge. Met-Ed assailed the contract rate on the ground that it jeopardized the public interest by eroding Met-Ed's ability to discharge its service obligations, by imposing a disproportionate financial burden on other customers and—in comparison with rates charged similarly situated customers—by discriminating.[14] In an initial decision, the judge rejected Met-Ed's assessment on all three counts[15] and, concluding that the Middletown contract was insulated by the *Mobile-Sierra* doctrine against unilateral modification,[16] dismissed Met-Ed's petition.[17]

Met-Ed filed exceptions to this ruling. The Commission, adopting the initial decision, affirmed,[18] and subsequently refused to reconsider.[19] This petition for review then ensued. Met-Ed, abandoning two of its earlier positions, presses for reversal solely on the theory that the one-cent contract rate is unduly discriminatory.[20]

7. J.App. 50.

8. *Metropolitan Edison Co.*, F.P.C. No. E–8832, (initial decision Sept. 2, 1975) (unreported), at 4, J.App. 59.

9. *Id.* The Commission's staff placed the 1972 revenue shortfall at $218,304, while Met-Ed quoted the higher figure mentioned in text. *Id.*

10. *Id.* at 5 n. 6, J.App. 60. Met-Ed's total revenues for 1972 reached nearly $160 million. *Id.*

11. *Id.* Total revenues in 1973 were approximately $172.5 million.

12. Petition of Metropolitan Edison Company (March 6, 1974), J.App. 40.

13. Pursuant to § 206(a) of the Act, 16 U.S.C. § 824e(a) (1976), quoted *supra* note 4. *Metropolitan Edison Co.*, F.P.C. No. E–8832 (order establishing Section 206 proceeding June 6, 1974) (unreported), J.App. 52.

14. See *Metropolitan Edison Co.* (initial decision), *supra* note 8, at 4–9, J.App. 59–64. Met-Ed also urged other so-called public interest considerations. It maintained that adherence to the contract means that Middletown will have to put up with more unsightly transmission lines in residential neighborhoods than if it had accepted Met-Ed's offer to supply power at a second delivery point for the prevailing rather than the contract rate. *Id.* at 9–10, J.App. 64–65. Met-Ed also argued that the lower contract rate encourages consumption of scarce electricity. *Id.* at 10, J.App. 65. This listing is not exhaustive.

15. *Id.* at 4–11, J.App. 59–66.

16. *Id.* at 11, J.App. 66.

17. *Id.* at 12, J.App. 67.

18. *Metropolitan Edison Co.* (Opinion No. 764), *supra* note 2, J.App. 72.

19. *Metropolitan Edison Co.* (order denying rehearing), *supra* note 2, J.App. 78.

20. The three principal contentions originally advanced by Met-Ed, see text *supra* at note 14,

## II

■ The relevant legal terrain is largely charted by the Supreme Court's decision in *FPC v. Sierra Pacific Power Co.*[21] The Court there held that a public electric utility subject to regulation under the Federal Power Act cannot unilaterally abrogate a contractually-fixed rate simply by filing a new rate under Section 205(d) and securing Commission approval thereof under Section 205(e).[22] Rather, the Court explained, the Commission may change the agreed-upon rate only if it finds under Section 206(a) that it is "unjust, unreasonable, unduly discriminatory or preferential."[23] And since, as the Court declared, "the purpose of the power given the Commission by § 206(a) is the protection of the public interest, as dis-

tinguished from the private interests of the utilities,"[24] that power is exercisable only when "the [contract] rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory."[25]

■ The service agreement in suit makes clear beyond peradventure the parties' bargain on duration of the one-cent rate established for power supplied to Middletown. It specifies unequivocally that "this contract shall continue in full force indefinitely until terminated by the Borough upon six months' notice in writing to the Company."[26] This provision, we conclude, is intercepted by the *Mobile-Sierra* doctrine,[27] and

were discussed at some length by the Commission. In rejecting Met-Ed's protest that its financial ability to operate was threatened, the Commission reasoned:

> The *de minimis* nature of [the 1974] deficit compared to Met-Ed's total electric revenues is the critical element in considering the effect on the public interest of the instant rate. While the utility argues that it has been forced to make substantial cuts in its *operations* budget, these cuts cannot be rationally associated with the Middletown contract. It is clear, certainly, that the $500,000.00 deficit incurred on the Middletown contract adversely affects the financial health of the company, but there is nothing in the record or the briefs to indicate that this deficit will, in any material way, impair the company's ability to continue service either to Middletown or to the remainder of Met-Ed's customers.

*Metropolitan Edison Co.* (Opinion No. 764), *supra* note 2, at 3, J.App. 74 (emphasis in original). In disposing of the argument that other customers of Met-Ed were imposed upon, the Commission said:

> Moving to the second element of the *Sierra* test, the question is whether Middletown's contract casts upon other consumers an excessive burden. The utility did not adduce substantial evidence indicating that the Middletown contract burdened Met-Ed's other customers excessively. In fact, Met-Ed's own witness, the Vice President of General Public Utilities Service Corporation (Met-Ed's parent) conceded that the revenue deficiency of Middletown was not passed on to the other customers of Met-Ed in any way. Even if the deficiencies occasioned by the Middletown contract were borne by the other customers of Met-Ed, that fact standing alone would not be dispositive. The *Sierra* test

> requires an *excessive* burden on other customers. It is doubtful indeed that the revenue shortfall of the size involved here could ever cast such a burden upon the other customers of a utility the size of Met-Ed. This is not to say, however, that at a future date the losses sustained as a result of Met-Ed's self-imposed, albeit improvident, bargain might not begin to cast some burdens on other customers, conceivably even to the point of coming within the *Sierra* guidelines. That point, however, simply has not been reached at this juncture.

*Id.* at 4, J.App. 75 (emphasis in original) (footnotes omitted). In this court, Met-Ed contests neither of these determinations, but only the Commission's adverse ruling on the claim of undue rate discrimination.

21. *Supra* note 1.

22. 350 U.S. at 353, 76 S.Ct. at 371, 100 L.Ed. at 394.

23. *Id.* at 353, 76 S.Ct. at 372, 100 L.Ed. at 394.

24. *Id.* at 355, 76 S.Ct. at 372, 100 L.Ed. at 395.

25. *Id.*

26. See text *supra* at note 7.

27. Compare, *e. g., United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra* note 1, 350 U.S. at 344, 76 S.Ct. at 381, 100 L.Ed. at 386; *FPC v. Sierra Pac. Power Co., supra* note 1, 350 U.S. at 353–355, 76 S.Ct. at 371–372, 100 L.Ed. at 394–395; *Appalachian Power Co. v. FPC,* 174 U.S. App.D.C. 100, 103 n. 13, 529 F.2d 342, 345 n. 13, *cert. denied,* 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976); *Richmond Power & Light v.*

thus can be revised only in conformity with *Sierra* criteria.[28] Indeed, Met-Ed does not argue to the contrary;[29] instead, it grounds its attack on the Middletown compact exclusively on discrimination,[30] the third *Sierra*-mentioned foe of the public interest.[31] Initially, Met-Ed argues that the Commission adopted an unduly restricted view of its authority under Section 206(a) to modify a fixed-rate contract as discriminatory.[32] Met-Ed then disputes the Commission's treatment of the rate differential among Met-Ed's customers occasioned by the Middletown agreement.[33] Neither contention persuades us.

## III

On the first matter, Met-Ed argues that each of *Sierra's* three illustrations of adverse consequences warranting disregard of a contractually-fixed rate possesses independent force, but that the Commission

considered the third—undue discrimination—to be merely repetitive of the second—excess burden on other customers.[34] To be sure, the Commission did point to the lack of financial harm to anyone but Met-Ed in finding the Middletown contract rate not unduly discriminatory.[35] That reference, however, is perfectly understandable and acceptable on this record, where nothing beyond disparate rates among Met-Ed's customers has been shown. We recognize that to a degree Met-Ed is correct: A rate arrangement may be unduly discriminatory even though consumers not paying the contract rate would not gain a rate decrease were the contract altered by the Commission. In *Town of Norwood v. FERC*,[36] we ruled that *Sierra*-type discrimination may emerge at the stage of contract formation, as when a utility negotiates a "sweetheart" contract with a favored customer;[37] *Sierra*, we held, does not permit "a utility to use a fixed-rate contract as a

*FPC*, 156 U.S.App.D.C. 315, 322–323, 481 F.2d 490, 497–498, *cert. denied*, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973).

**28.** *E. g., Permian Basin Area Rate Cases (Continental Oil Co. v. FPC)*, 390 U.S. 747, 820–822, 88 S.Ct. 1344, 1387–1389, 20 L.Ed.2d 312, 366–367 (1968); *FPC v. Sierra Pac. Power Co., supra* note 1, 350 U.S. at 353, 76 S.Ct. at 371–372, 100 L.Ed. at 394; *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra* note 1, 350 U.S. at 343, 76 S.Ct. at 380, 100 L.Ed. at 386. See also cases cited *supra* note 27.

**29.** In our view, the thesis of the dissent is inconsistent with the central underpinnings of *Mobile-Sierra* : The terms of the contract determine the parties' obligations; their agreement should be modified by the Commission under § 206(a) only if imperatively demanded by the public interest; and no such mandate arises solely from the unprofitability of the contract to the utility. See *Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra* note 28, 390 U.S. at 822, 88 S.Ct. at 1388–1389, 20 L.Ed.2d at 367; *FPC v. Sierra Pac. Power Co., supra* note 1, 350 U.S. at 355, 76 S.Ct. at 372, 100 L.Ed. at 395. See also *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., supra* note 1.

Furthermore, the approach of the dissent embraces artificial distinctions unsupportable in terms of *Mobile-Sierra* policies. So long as the public interest does not suffer thereby, why

should a utility improvident enough to enter into a long-term or purportedly perpetual fixed-rate contract be readily excused from its bargain while a utility promising to supply power at a fixed rate for some shorter term is required to keep its word? And where is the line between the two to be drawn? Without suggesting that the duration of a fixed-rate power-supply contract can never properly affect the Commission's determination whether the public interest warrants revision of the agreement, we are unable to accept the categorical analysis proposed by our dissenting brother.

**30.** As we have stated, Met-Ed has dropped two of the arguments it earlier had presented to the Commission. See note 20 *supra.*

**31.** See note 20 *supra* and accompanying text.

**32.** Brief for Petitioner at 14–17.

**33.** Brief for Petitioner at 18–30.

**34.** See text *supra* at note 25.

**35.** *Metropolitan Edison Co.* (Opinion No. 764), *supra* note 2, at 5–6, J.App. 76–77. See text *infra* at note 53.

**36.** 190 U.S.App.D.C. 409, 587 F.2d 1306 (1978).

**37.** *Id.* at 190 U.S.App.D.C. at 415–417, 587 F.2d at 1312–1314.

device to render unassailable an otherwise prohibited undue preference."[38]

██ Yet, Met-Ed's position remains incurably infirm because the possibility of discrimination of this sort was not ignored by the Commission. On the contrary, the Commission emphasized the substantial and unusual consideration for the one-cent contract rate given Middletown.[39] As the Middletown contract overtly acknowledges, "the Borough . . . practically abandon[ed] its [then-] present electric light plant at great loss to itself and [was] induced by the Company[40] to use the electricity and electric power of the Company as a matter of economy and advantage to the Borough. . . ."[41] A difference in rate treatment is not unduly discriminatory when the difference is amply justified,[42] and we cannot label as error the Commission's considered judgment that Middletown relinquished enough to immunize its special long-term one-cent rate from any suspicion of favoritism.

Moreover, the Commission found that Met-Ed had profited from the Middletown contract for many years.[43] From 1937[44] through 1971, the Middletown rate was higher than the average rate paid by all of the rest of Met-Ed's customers;[45] not until 1972 did the average rate exceed Middletown's.[46] It is true that for nine selected years between 1937 and 1973, the average rate to Kutztown—one of the two resale customers comparable to Middletown in type of service—was 1.29 cents, 0.29 cents higher than the rate to Middletown.[47] On the other hand, Hershey Electric Company, the other such customer, had since 1969 been charged an average rate of 0.92 cents, .08 cents less than the Middletown

**38.** *Id.* at 190 U.S.App.D.C. 416, 587 F.2d at 1313. Met-Ed's attempt to secure an increase in the Middletown rate was made in the context of a § 206(a) proceeding exclusively. None of Met-Ed's customers has complained, pursuant to § 205(b), 16 U.S.C. § 824d(b) (1976), about the rates Met-Ed exacts from them. This distinguishes the situation in the instant case from that presented in *Norwood* and *Boroughs of Chambersburg v. FERC,* 188 U.S.App.D.C. 310, 580 F.2d 573 (1978). In *Chambersburg* we held that a difference in rates among a utility's customers "due *solely* to the fact that [the lower-rate customers] were protected by the *Mobile-Sierra* doctrine" portends no violation of the antidiscrimination provision of § 205(b). 188 U.S.App.D.C. at 314, 580 F.2d at 577 (emphasis in original). *Norwood* recognized that when *Mobile-Sierra* and § 205(b) are indeed on a collision course, they can be reconciled in appropriate cases by revising the rates charged those customers who are not parties to fixed-rate contracts. *Town of Norwood v. FERC, supra* note 36, 190 U.S.App.D.C. at 415–418, 587 F.2d at 1312–1315.

Met-Ed gains nothing from reliance on cases interpreting § 205(b)'s ban on "undue discrimination," *e. g., St. Michael's Utils. Comm'n v. FPC,* 377 F.2d 912 (4th Cir. 1967). No consumer complains in this litigation and "it is possible to have discrimination that violates § 205(b) but does not dismantle the protection generally afforded to fixed-rate contracts under *Mobile-Sierra.*" *Town of Norwood, supra* note 36, 190 U.S.App.D.C. at 417 n. 21, 587 F.2d 1314 n. 21. See *Public Serv. Co. v. FERC,* 575 F.2d 1204, 1212 (7th Cir. 1978) (rates found unduly discriminatory for purposes of § 205(b) held not unduly discriminatory for purposes of *Mobile-Sierra* and § 206(a)).

**39.** See note 18 *supra* and accompanying text.

**40.** The reference, of course, is to York Haven Water & Power Co., Met-Ed's corporate predecessor. See text *supra* at note 5.

**41.** See text *supra* at note 7.

**42.** See, *e. g., Boroughs of Chambersburg v. FERC, supra* note 38, 188 U.S.App.D.C. at 314, 580 F.2d at 577; *St. Michael's Utils. Comm'n v. FPC, supra* note 38, 377 F.2d at 915.

**43.** *Metropolitan Edison Co.* (initial decision), *supra* note 8, at 7–9, J.App. 62–64. It will be recalled that the Commission adopted this initial decision of the administrative law judge without reservation. See text *supra* at note 18.

**44.** 1937 is the earliest year for which records have been submitted. *Id.* at 8, J.App. 63; Exhibit No. 42, J.App. 38–39.

**45.** *Metropolitan Edison Co.* (initial decision), *supra* note 8, J.App. 63. During this period, the average paid by Met-Ed's other resale customers ranged from a low of 0.78 cents during 1956 through 1958 to a high of 0.93 in 1945. J.App. 38–39.

**46.** The average rate for other customers was higher than the Middletown rate by 0.07 cents in 1972 and 0.08 cents in 1973. J.App. 39.

**47.** *Metropolitan Edison Co.* (Opinion No. 764), *supra* note 2, at 5 n.6, J.App. 76.

contract rate.[48]  It is no great wonder, then, that the Commission accepted the administrative law judge's finding "that the Borough of Middletown, if anyone, had been discriminated against by the rate for the last 65 years."[49]  And, we again note, there is nothing in the record to indicate that either Kutztown or Hershey yielded anything comparable in value to Middletown's power-plant surrender for the rates they were able to obtain.

These circumstances are hardly hallmarks of a sweetheart arrangement.[50]  Rather, as the Commission declared, the only discernible reason for current rate differentials between Middletown and any other Met-Ed customer similarly situated is the atypical concession that Middletown's 1906 town council made to Met-Ed's predecessor.[51]  In short, the Commission did not misconceive its authority under *Sierra* to revise fixed-rate agreements when unduly discriminatory, nor did it plainly misapprehend the real genesis of the rate differentials occasioned by Met-Ed's arrangement with Middletown.

## IV

Met-Ed's second contention amounts to little more than a plea that we balance de novo the public interest in preserving the integrity of power-supply contracts against the perceived unfairness and undesirable incentives assertedly flowing from a contract rate lower than the rate some other consumer is charged.  Met-Ed is simply taking a different view of evenhandedness and the public weal than did the Commission.  In reaching its public-interest resolution in this case, the Commission succinctly identi-

fied the considerations it thought to be of major significance:

> There is no contention that Kutztown's is not a just and reasonable rate; nor even that all other parties to rate RT [52] are not paying just, reasonable, and non-excessive rates.  Even if there is discrimination, there appears to be no damage to these third parties.  They would receive no reduction were we to uphold Met-Ed's position here.  Even were damages to be found, the fact that Middletown's customers would sustain a 50% rate increase raises substantial questions regarding whether the public interest would best be served by bailing Met-Ed out of its unwise bargain.  The equities, once balanced, favor upholding the contract.[53]

Other factors urged by Met-Ed as of moment in the public-interest calculus—notably, the asserted imprudence of encouraging consumption of energy by selling it cheaply—were considered and dismissed by the administrative law judge as either speculative or de minimis,[54] and the Commission unreservedly concurred.[55]

■ The Commission's regulatory charter "contemplates abrogation of [fixed-rate] agreements only in circumstances of unequivocal public necessity."[56]  In this light, we see no ground for disturbing the Commission's assessment.  As the Commission rightly noted,[57] its function was "not only to appraise the facts and draw inferences from them but also to bring to bear upon the problem an expert judgment and determine from analysis of the total situation on which side of the controversy the public

48.  *Id.* at 5, J.App. 76.

49.  *Id.*

50.  *Cf. Town of Norwood v. FERC*, 190 U.S. App.D.C. 409, 587 F.2d 1306, *supra* note 36.

51.  *Metropolitan Edison Co.* (Opinion No. 764), *supra* note 3, at 5, J.App. 76.

52.  Rate RT is described by the Commission as "applicable to the company's other 69 Kv wholesale customers."  *Metropolitan Edison Co.* (Opinion No. 764), *supra* note 2, at 1, J.App. 72.

53.  *Id.* at 6, J.App. 77 (footnote omitted).

54.  See note 14 *supra.*

55.  See note 18 *supra* and accompanying text.

56.  *Permian Basin Area Rate Cases (Continental Oil Co. v. FPC)*, *supra* note 28, 390 U.S. at 822, 88 S.Ct. at 1389, 20 L.Ed.2d at 367.

57.  *Metropolitan Edison Co.* (order denying rehearing), *supra* note 2, at 7, J.App. 81.

interest lies."[58] We find the Commission's assessment of the public interest reasonable and well within the bounds of its authority and discretion.

■ We do not understand that the Commission, in declining Met-Ed's invitation to upset the Middletown contract rate, has validated that rate for all time. The Commission expressly recognized that the bargain with Middletown conceivably could eventually saddle other Met-Ed customers with such burdens as to bring *Sierra* into play.[59] There is no reason for supposing that the Commission did not realize that future conditions might implicate *Sierra* in some other manner. It bears repeating that "denying . . . companies the power unilaterally to change their contracts in no way impairs the regulatory powers of the Commission, for the contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest."[60] Our mission, of course, is to adjudge the Commission's present determination on the record before us, and on that basis the orders under review must be

*Affirmed.*

WILKEY, Circuit Judge, dissenting:

In *Mobile* and *Sierra* the Supreme Court promulgated rigorous standards for invoking the public interest to terminate fixed-rate contracts. However, those cases involved *fixed-term* contracts of 10 and 15 years, respectively. It is my view that the strict standards in *Mobile* and *Sierra* were enunciated with fixed-term contracts in mind and *were not intended to apply to perpetual contracts of the type at issue here.*

The contract in this case was entered into by Metropolitan Edison's predecessor in 1906, even before there was state or federal regulation of these transactions. The contract has already run for 72 years. Metropolitan Edison has suffered losses on the contract in 39 of the past 41 years. At present, the contract rate is less than one half of the just and reasonable rate being charged comparable customers; it covers less than one half of the cost of providing the service and, since 1974, has not even covered the fuel costs.

Because the contract is small relative to Metropolitan Edison's total business, the company's other customers are able to carry the financial load occasioned by these losses. Nevertheless, these losses are having an adverse impact on the company's performance and have contributed materially to an impairment of resources. The company has experienced a series of financial difficulties which in 1974 became so serious that it was forced to curtail its construction program below a level it deemed prudent and to cut expenses relating to current service. Its losses under the contract rate, which have increased from less than $300,000 in 1972 to more than $500,000 in 1974, represented revenues urgently needed to provide for future load growth as well as to maintain the quality of current service. By reducing interest coverage and the attractiveness of Metropolitan Edison's securities generally, the contract rate also adversely affects other customers in terms of higher capital costs, particularly at times when the company is unable to issue funded debt and must resort to costlier financing.

The Commission admits that there is no reasonable possibility that at any time in the foreseeable future fuel costs are going to drop to a level at which they can be

**58.** *United States v. Detroit & Cleveland Navigation Co.,* 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38, 42 (1945), quoted in *FPC v. Transcontinental Gas Corp.,* 365 U.S. 1, 7, 81 S.Ct. 435, 439, 5 L.Ed.2d 377, 383 (1960).

**59.** *Metropolitan Edison Co.* (Opinion No. 764), *supra* note 2, at 4, J.App. 75.

**60.** *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra* note 1, 350 U.S. at 344, 76

S.Ct. at 381, 100 L.Ed. at 386. See also *FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 646, 92 S.Ct. 1827, 1841, 32 L.Ed.2d 369, 388 (1972); *Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra* note 28, 390 U.S. at 820–821, 88 S.Ct. at 1388, 20 L.Ed.2d at 366; *FPC v. Sierra Pac. Power Co., supra* note 1, 350 U.S. at 353–355, 76 S.Ct. at 371–372, 100 L.Ed. at 394–395.

covered by the existing contract rate. Indeed, it admits that fuel costs are going to remain high and most probably increase. Thus, the Commission acknowledges that there is no way that this contract will be anything but a sheer loss and an increasing drain on the company. Unless the Commission grants relief, this situation will continue indefinitely into the future. Presumably, this contract will still be in effect in the year 2079 A.D., and Middletown will have been reaping the benefits of these rates for 1¾ centuries.

The Supreme Court could not have contemplated this result in *Mobile* and *Sierra*. As already stated, those cases involved limited fixed-term contracts of 10 and 15 years, respectively. Within that context the Supreme Court set forth standards which reconciled the public's interest in regulation with the principle of contract stability. However, in the context of a *perpetual contract,* these two considerations of (1) public interest and (2) contract stability *take on an entirely different character.*

While this court should be guided by the same two considerations in its treatment of perpetual contracts, it should not be bound by the precise standards formulated in the wholly different context of fixed-term contracts. In my view, rates in a perpetual contract are *unduly* discriminatory when they have already resulted in substantial losses for the last four decades, when they presently do not even cover the cost of fuel, when they are less than one half of the just and reasonable rates charged comparable customers, when they are admittedly discriminatory and will continue to be so indefinitely into the future. It is folly for the Commission to stay its hand. Applying the two *Mobile-Sierra* considerations: Whose interests are served? How is the public interest served? How is general interest in preserving the stability of supply arrangements served?

I respectfully dissent.