20 F.3d 494
 305 U.S.App.D.C. 304
 LONG ISLAND LIGHTING COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Municipal Electric Utilities Ass'n of New York State, Power
Authority of the State of New York, Intervenors.
 No. 92-1438.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 9, 1993.
Decided April 15, 1994.
 
 1
 Petition for Review of an Order of the Federal Energy Regulatory Commission.
 
 
 2
 Richard A. Visconti, Hicksville, NY, argued the cause for petitioner. With him on the briefs was Arnold H. Quint, Washington, DC.
 
 
 3
 Howard B. Schneider, Atty., Federal Energy Regulatory Commission ("FERC"), Washington, DC, argued the cause for respondent. With him on the brief were Jerome M. Feit, Sol., FERC, and Joseph S. Davies, Deputy Solicitor, FERC, Washington, DC.
 
 
 4
 Thomas L. Rudebusch, Washington, DC, argued the cause for intervenors. With him on the brief were Wallace L. Duncan and Jeffrey C. Genzer, Washington, DC. Wendy M. Lane, New York City, entered an appearance for intervenor Power Authority of the State of New York.
 
 
 5
 Before BUCKLEY and WILLIAMS, Circuit Judges, and JOHN W. REYNOLDS,* District Judge for the Eastern District of Wisconsin.
 
 
 6
 Opinion for the court filed by District Judge REYNOLDS.
 
 REYNOLDS, District Judge:
 
 7
 The Long Island Lighting Company ("LILCO") seeks review of a decision of the Federal Energy Regulatory Commission ("the Commission") holding that contracts between LILCO and the New York Power Authority ("NYPA") did not give LILCO the right to curtail its transmission of electricity to NYPA's customers on Long Island.[1] For reasons stated below, we conclude that the Commission's interpretation of the contracts was in error, and we therefore reverse.
 
 I. BACKGROUND
 A. Facts
 
 8
 In 1981, LILCO, a gas and electric utility serving Long Island, New York, entered into two agreements with NYPA, a corporate agency of the State of New York that supplies hydroelectric power to various municipalities and businesses. The agreements required LILCO to transmit power generated by NYPA to certain of NYPA's customers located on Long Island. LILCO's obligation to provide such transmission services was expressly conditioned, however, on its ability to do so without sacrificing "reliabl[e] and economical[ ] service [to] its own customers." (Joint Appendix ("J.A.") at 18-19, 33-34.) LILCO's "own customers" were those to whom LILCO actually supplied power, either by generating it or purchasing it, as distinguished from those to whom LILCO merely transmitted power that had been supplied by others, as in the case of NYPA's customers. Service to NYPA's customers was thus assigned a lower priority than service to LILCO's customers.
 
 
 9
 This arrangement was to be effectuated, pursuant to Section 1.2 of the 1981 agreements, as follows. On the first day of each year, NYPA would notify LILCO of its "anticipated scheduled" transmission needs "for each month from June of the same year through May of the following year." (Id. at 19-20, 34.) LILCO would then have until March 1 to notify NYPA whether the requested transmission services would be made available. LILCO was required to provide such services if:
 
 
 10
 the actual capability of its transmission system allows LILCO to transmit [the quantity of power NYPA wishes to have transmitted] and also allows LILCO to meet its obligations to the Municipalities and to import power from generating facilities it owns in whole or in part located outside of its service territory and to import power it plans to purchase pursuant to contracts of six months' duration or longer.
 
 
 11
 (Id. at 20-21, 34 (emphasis added).)
 
 
 12
 Until 1991, power was transmitted from the mainland to Long Island primarily by way of a single cable, the "Y-50" cable, which, jointly owned by LILCO and the Consolidated Edison Company of New York, Inc., lay beneath Long Island Sound. By the late 1980s, it had become evident that there was, or soon would be, the need for additional transmission capacity between the mainland and Long Island, and so plans were developed for the construction of a second cable, the "Y-49 cable." LILCO might have financed the project itself but was not in a financial position to do so (owing in part to its difficulties with the Shoreham Nuclear Power Plant). Instead, in 1987, LILCO and NYPA entered into a contract, the Sound Cable Project Facilities and Marketing Agreement ("SCP Agreement"), whereby NYPA agreed to finance construction of the Y-49 cable and LILCO agreed to reimburse NYPA for construction costs through monthly payments for use of the cable.
 
 
 13
 NYPA, which retained ownership of the Y-49 cable under the SCP Agreement, also retained control over allocation of the cable's transmission capacity. In that regard, Section 7.4 of the SCP Agreement provides:
 
 
 14
 LILCO shall initially be allocated the full capacity of the [Y-49 cable]. In the event that [NYPA] allocates [Y-49 cable] capacity to other parties, LILCO's monthly payment obligations ... shall be [proportionately] reduced during the period of such allocation....
 
 
 15
 (J.A. at 54 (emphasis added).) On the subject of responsibility for operation and maintenance, Section 5.1 of the SCP Agreement provides:
 
 
 16
 [NYPA] shall be responsible for the operation and maintenance of the [Y-49 cable]; however, LILCO agrees to operate and to perform routine maintenance functions on the [portions of the cable facilities] which are within LILCO's service area. LILCO further agrees that it will operate and maintain the [Y-49 cable] in accordance with procedures approved by [NYPA] after consultation with LILCO ... Nothing in this agreement shall preclude [NYPA] from performing such [routine maintenance] functions itself or, after consultation with LILCO, to subcontract to third parties for such work.
 
 
 17
 (J.A. at 48-49 (emphasis added).)
 
 
 18
 At one point during the negotiations leading up to the SCP Agreement, LILCO proposed that the new Y-49 cable, rather than the old Y-50 cable, be used for transmission of power to NYPA's Long Island customers and that NYPA therefore pay "a direct proportionate share" of the cost of the Y-49 cable, which, being new, was far more expensive to use than the Y-50 cable. (J.A. at 74.) Such an arrangement would be justified, LILCO claimed, because "[u]nder some conditions, LILCO may be forced to terminate [transmission] to [NYPA's] customers [on the Y-50 cable,] and only this new interconnection will permit the reestablishment of service." (Id.) NYPA refused to accept the proposal, however, on the ground that it would shift "a disproportionate share of the [Y-49 cable] costs to [NYPA's] customers." (Id. at 76.) Further, NYPA contended, "If LILCO wishes to pursue this matter, the proper vehicles are the applicable [1981] transmission agreements under which LILCO delivers [NYPA] power to these customers and not the SCP agreement." (Id. at 77.) There does not appear to have been any subsequent negotiation on this point.
 
 
 19
 The Y-49 cable was scheduled to be completed in June 1991 and to become operational in October 1991. On December 28, 1990, in accordance with the 1981 agreements, NYPA notified LILCO of its anticipated transmission needs for the annual period beginning June 1, 1991. In response, on February 8, 1991, LILCO notified NYPA that it would not be able to provide the requested transmission services because the capacity of the Y-50 cable was insufficient to accommodate transmission to both NYPA's customers and LILCO's. LILCO therefore suggested that NYPA exercise its right under Section 7.4 of the SCP Agreement to allocate to itself a portion of the Y-49 cable's capacity and use that as an alternative means of transmitting power to Long Island, an option that would proportionately reduce LILCO's payments to NYPA for use of the Y-49 cable.
 
 
 20
 Instead, NYPA filed a complaint with the Commission claiming that LILCO's refusal to provide the requested transmission services violated the 1981 agreements. Under those agreements, NYPA claimed, "the actual capability of [LILCO's] transmission system" includes not only the capacity of the Y-50 cable, as LILCO claimed, but also that of the Y-49 cable, and is therefore sufficient to permit transmission to both NYPA's and LILCO's customers. It appears to be undisputed that if the capacity of the Y-49 cable is not taken into account, LILCO's transmission system does not have sufficient capacity to serve both NYPA's and LILCO's customers.
 
 B. The Commission's Decision
 
 21
 On February 26, 1992, the Commission entered "summary disposition" in favor of NYPA, on the ground that LILCO should have counted the capacity of the Y-49 cable in determining the "actual capability of its transmission system" under the 1981 agreements. The Commission found that the phrase "actual capability," both "on its face" and "as generally used in the industry," refers to "all facilities under a utility's control, whether by ownership or otherwise." (J.A. at 189-90.) The Y-49 cable was held to be under LILCO's control because:
 
 
 22
 Although, under the SCP Agreement, NYPA financed, built, and owns the [Y-49 cable], LILCO has the primary responsibility to operate the facilities and pays all costs of building and maintaining the [cable]. Furthermore, LILCO has been allocated [Y-49 cable] capacity by NYPA....
 
 
 23
 (J.A. at 190.) In addition, the Commission found it significant that LILCO was "assure[d]" as a practical matter of continued access to the cable, both because NYPA had represented as much and because the "physical reality" of the cable makes it of little use to anyone other than LILCO or NYPA. (Id. at 191.)
 
 
 24
 The Commission emphasized, however, that the cable would be considered part of LILCO's transmission system "only to the extent that NYPA assures LILCO that [the cable's] capacity will be available to LILCO for each following annual period." (Id. at 190 (emphasis in original).) Such assurance was to be provided in writing by January 1 of each year, the Commission held, giving LILCO enough time "to decide ... whether to accept NYPA's proposed transmission schedule for the following annual period." (Id. at 191.)
 
 
 25
 On July 23, 1992, the Commission reiterated the main points of its February 26 decision in an order denying LILCO's request for rehearing. LILCO's petition for review followed.
 
 II. ANALYSIS
 
 26
 The Commission's interpretation of ambiguous language in a contract subject to its jurisdiction is entitled to deference as long as the interpretation is reasonable. Williams Natural Gas Co. v. F.E.R.C., 3 F.3d 1544, 1551 (D.C.Cir.1993); Duke Power Co. v. F.E.R.C., 864 F.2d 823, 826 (D.C.Cir.1989). In this case, to be sure, the pertinent contractual language, "actual capability of its transmission system," contains an ambiguity in the sense that it does not precisely identify the facilities to which it refers. Nevertheless, because we do not find that the Commission's interpretation of the phrase was reasonable, we cannot defer to it.
 
 
 27
 In its decision, the Commission dwelt primarily on the meaning of the term "actual capability," which it took to refer to the capability of "all facilities under a utility's control, whether by ownership or otherwise." We would have begun, instead, with the words "its transmission system," since the parties' disagreement in this case is over which cables that phrase comprises, not over how much power the cables are capable of transmitting. But this turns out to be an inconsequential point. If the possessive adjective "its" may be said to express something along the lines of ownership or control, see Webster's II New Riverside University Dictionary 918 (1988), then as a definition of "its transmission system," the Commission's definition of "actual capability" serves as well as any: "all facilities under a utility's control, whether by ownership or otherwise." We agree with the Commission, therefore, that if the Y-49 cable is in some sense under LILCO's control, it should be considered part of "its [i.e., LILCO's] transmission system" for purposes of Section 1.2 of the 1981 agreements.
 
 
 28
 It is undisputed that NYPA, not LILCO, has ownership of the Y-49 cable. The Commission concluded, nonetheless, that LILCO actually controls the cable, a conclusion based in part on certain provisions of the SCP agreement and in part on facts extrinsic to it. The first provision of the SCP agreement found to contribute to LILCO's control of the cable was one that, according to the Commission, gives LILCO "the primary responsibility to operate the [Y-49 cable] facilities." This statement, though, does not accurately paraphrase the relevant provision. Section 5.1 of the agreement (quoted in full above) provides that NYPA, not LILCO, "shall be responsible for operation and maintenance of" the new cable. While LILCO agrees "to operate and to perform routine maintenance functions on" the portions of the cable within its service area, it must do so "in accordance with procedures approved by [NYPA] after consultation with LILCO," and NYPA remains free to do the work itself, or, "after consultation with LILCO, to subcontract to third parties for such work." With respect to operation and maintenance, therefore, LILCO essentially acts as NYPA's agent, and as an at-will agent besides. Even if this subordinate role were found to give LILCO some measure of control over operation and maintenance, it could not be found to confer any control whatsoever over allocation of the cable's capacity, which, for purposes of the 1981 agreements, is all that matters.
 
 
 29
 The second provision of the SCP agreement that the Commission found indicative of LILCO's control over the Y-49 cable is the requirement that LILCO pay, in the Commission's words, "all costs of building and maintaining the" cable. Indeed, although LILCO's obligation to pay does not itself confer control of the cable, it does seem to suggest that both parties expected LILCO to have some degree of control, for why else would LILCO agree to pay for the whole thing? But the answer is that LILCO did not necessarily agree to pay for the whole thing. Rather, under Section 7.4 of the agreement, the amount LILCO must pay is determined by the amount of Y-49 cable capacity it is allocated; if it is allocated nothing, it pays nothing. So although LILCO potentially could pay the full cost of the cable under the SCP agreement, whether it actually does so depends on how NYPA chooses to allocate the cable's capacity. LILCO's payment obligation therefore does not indicate that LILCO was expected to control the cable.
 
 
 30
 The third provision of the SCP agreement that the Commission found to establish LILCO's control over the Y-49 cable was the requirement that LILCO "initially be allocated the full capacity of" the cable. We might agree that this requirement, found in Section 7.4 of the agreement (quoted in full above), gives LILCO a measure of control over the cable were there anything in it limiting NYPA's ability to withdraw Y-49 capacity from LILCO, but there is not. "Initially" having passed upon execution of the SCP agreement, NYPA is contractually free to withdraw any or all of the cable's capacity from LILCO at any time, with or without providing advance notice. Once that happens, LILCO has no contractual guarantee that it will ever again be granted access to the cable's capacity or that any access it is granted will continue for some minimum period of time. Being "initially" allocated Y-49 capacity is therefore not the same as being given control of it.
 
 
 31
 The Commission implicitly acknowledged as much, for it ultimately concluded that LILCO's control of the Y-49 cable depended not on Section 7.4 or any other provision of the SCP agreement, but on facts extrinsic to the agreement. One of them concerned what the Commission called the "physical reality" of the Y-49 cable: a "submarine cable" connected at one end to Long Island and at the other to mainland New York, the Y-49 cable is, the Commission noted, "of little use to anyone but [LILCO and NYPA]" (apparently because no one else can have power transmitted to Long Island), thus substantially diminishing the likelihood that NYPA would even want to deny LILCO access to the cable. (J.A. at 191.) Assuming this to be true, however, we do not agree that the practical likelihood of LILCO's having continued access to the cable translates into LILCO's having control of the cable for purposes of Section 1.2 of the 1981 agreements. Again, that section requires LILCO to determine, not merely estimate, what the "actual capability of its transmission system" will be more than one year into the future. The capacity of the Y-49 cable simply cannot be included in that determination when LILCO has no formal assurance of continued access to it.
 
 
 32
 Authorities cited in the Commission's decision in fact recognize the significance of a formal right of access or control. In support of its conclusion that the "actual capability" of LILCO's transmission system is not limited to the capability of the facilities it owns, the Commission cited various utility industry authorities for the proposition that, in the case of determining power capability, "system capability" refers to "the system's own generating station capability plus 'capability available ... from other sources through firm power contracts.' " (J.A. at 190 n. 54 (citations omitted, emphasis added).) Power from other sources, therefore, is counted toward a utility's power capability not when it is available as a practical matter, but when it is available as a matter of contractual right. The same should be true with respect to transmission capability, the issue in this case, if the Commission's analogy between transmission capability and power capability is sound. Whatever the "physical reality" of the Y-49 cable, therefore, LILCO does not have control of the cable for purposes of the 1981 agreements unless it has a right to control of the cable.
 
 
 33
 The second fact extrinsic to the SCP agreement that the Commission found significant, indeed determinative, had to do with NYPA's "assurances" regarding LILCO's access to the cable. The Commission held that the Y-49 cable would be considered part of LILCO's transmission system "only to the extent that NYPA assures LILCO that [the cable's] capacity will be available to LILCO for [the] following annual period [i.e., from June of the current year through May of the following year]." Though NYPA had not yet provided any such assurance, it had represented in its complaint that it "has not allocated any capacity to other parties and has no plans to do so, nor does it plan to withdraw capacity from LILCO" (J.A. at 8), a statement the Commission interpreted "to mean that NYPA will not revoke its allocation to LILCO of the [Y-49] capacity for" the then-current annual period, June 1991 through May 1992. (Id. at 191.) In the future, the Commission held, NYPA would be required to provide the assurance in writing by January 1 of each year (with the exception of the then-current year, 1992, in which NYPA would have until February 27 to provide the written assurance). (Id.)
 
 
 34
 Making LILCO's obligations turn on NYPA's unilateral assurances regarding control of the Y-49 cable is problematic for a few reasons. The first is that with respect to the then-current annual period, June 1991 through May 1992, NYPA had not provided any such assurance. Its statement that it did not "plan" to withdraw capacity from LILCO did not commit NYPA to anything, for NYPA could change its plans tomorrow. Even accepting the Commission's somewhat strained interpretation of the statement to mean that NYPA "will not revoke its allocation" of capacity to LILCO during the then current annual period, the statement still only amounted to an unpaid-for promise on NYPA's part, as nothing in the SCP agreement required NYPA to give such an assurance. NYPA's statement therefore did not formally bind NYPA unless LILCO detrimentally relied upon it, and there is no evidence that it did. See Lord, 4 Williston on Contracts Sec. 8:1 (4th ed. 1992).
 
 
 35
 Assurances provided by NYPA for annual periods subsequent to the 1991-1992 period would, however, be made pursuant to the Commission's decision, and presumably this would make them binding. But that raises the question of where the assurance requirement came from in the first place. There is no suggestion in the Commission's decision that the requirement is derived from an interpretation of the SCP agreement, or that it represents a reformation of the agreement based on the parties' true but inaccurately recorded intentions. To the extent it compels NYPA to allocate Y-49 capacity on an annual basis, the assurance requirement actually conflicts with the unfettered discretion afforded NYPA in Section 7.4 of the agreement. This section provides in part that if NYPA decides to allocate Y-49 capacity to someone other than LILCO, LILCO's "monthly payment obligation" is to be proportionately reduced "during the period of such allocation," indicating that the period of allocation need not be a full year, but could be as short as a month.
 
 
 36
 If the assurance requirement was not derived from an interpretation of the parties' agreement, then necessarily it modified the agreement. Under Section 206(a) of the Federal Power Act, 16 U.S.C. Sec. 824e(a), the Commission is empowered to modify a contract if, "after a hearing," the contract is found to be "unjust, unreasonable, unduly discriminatory or preferential" and is also found "to adversely affect the public interest." Fed'l Power Comm'n v. Sierra Pac. Power Co., 350 U.S. 348, 355, 76 S.Ct. 368, 372, 100 L.Ed. 388 (1956); San Diego Gas & Elec. Co. v. Fed'l Energy Reg'y Comm'n, 904 F.2d 727, 732 (D.C.Cir.1990); Metropolitan Edison Co. v. Fed'l Energy Reg'y Comm'n, 595 F.2d 851, 856 n. 29 (D.C.Cir.1979). In this case, however, the Commission did not hold a hearing and did not mention Section 206(a) or the standards applicable to a determination under it. Indeed, in its decision denying rehearing, the Commission noted that it "may not read into agreements that which is simply not expressed; the Commission has an obligation under the FPA to enforce contracts as they were written by the parties consistent with the public interest." (J.A. at 316 (citations omitted).) Because the Commission did not have the power to modify NYPA's or LILCO's contractual obligations in this case, the assurance requirement it imposed cannot be valid.
 
 
 37
 Quite apart from that, the logic of imposing the requirement is far from clear. If, as the Commission initially concluded, the SCP agreement and the "physical reality" of the Y-49 cable give LILCO enough control over the cable to make it part of LILCO's transmission system, then LILCO should have no need for NYPA's annual written assurance. Conversely, if such assurance is necessary, the implication is that without it LILCO does not control the cable in such a way as to make it LILCO's. But if that is the case, then under the Commission's own standard the cable should not be considered part of LILCO's transmission system.
 
 
 38
 In short, neither the Commission by fiat nor NYPA by a nonbinding promise can give LILCO control of the Y-49 cable if LILCO's agreements with NYPA do not.
 
 
 39
 A final point to be discussed concerns the negotiations between NYPA and LILCO leading up to the SCP agreement, during which LILCO at one point proposed the very thing it now demands as a matter of right, namely, that the Y-49 cable, rather than Y-50, be used for transmission of power to NYPA's Long Island customers, and that those customers therefore pay a "direct proportionate share" of the cost of the new cable. If LILCO, as it claims, has always had the right by virtue of the 1981 agreements to force NYPA's customers onto the Y-49 cable when transmission to LILCO's own customers exhausts the capacity of the Y-50 cable, then why did LILCO need to ask NYPA for approval of this arrangement? The implication, urged by the Commission, is that LILCO must have assumed it did not enjoy such a right.
 
 
 40
 It is equally possible, however, that LILCO simply had not thought carefully about the relationship between the 1981 agreements and the SCP agreement, or that, being the acknowledged underdog in terms of bargaining power, LILCO wished to avoid antagonizing NYPA while the SCP negotiations were still underway. Since they were underway, furthermore, it is difficult to know (and the record does not indicate) whether the provisions of the SCP agreement regarding control of the Y-49 cable had yet been finalized. If not, then LILCO might very well have assumed, incorrectly as it turned out, that the final contract would give it some formal right of control over the cable, so that the cable would indeed become part of "its transmission system."At any rate, we find it unnecessary to speculate about the parties' precontractual expectations regarding control of the Y-49 cable when their formal expectations are spelled out in the language of the SCP agreement, which, as discussed above, does not give LILCO a right of control over the cable. Because, as the Commission itself held, some such control is necessary to make the cable part of LILCO's transmission system, we conclude that it was not reasonable for the Commission to interpret the phrase "actual capability of its transmission system" in Section 1.2 of the 1981 agreements as encompassing the capability of the Y-49 cable. For this reason, LILCO's petition for review is granted and the Commission's summary disposition in favor of NYPA is
 
 
 41
 Reversed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 We have jurisdiction over the appeal by virtue of Section 313(b) of the Federal Power Act, 16 U.S.C. Sec. 825l (b)